## TRAVELERS' INS. CO. OF HARTFORD, CONN., v. BERGERON.*

Circuit Court of Appeals, Eighth Circuit.

March 31, 1928.

No. 7969.

1. Witnesses ⬤184(1)—Privilege as to communications between patient and physician is purely statutory (Code Iowa 1924, § 11263).

Privilege as to communications between patient and physician is governed purely by Code Iowa 1924, § 11263, since there is no such privilege at common law.

2. Witnesses ⬤209—Privilege regarding communications between patient and physician extends only to facts coming to physician's knowledge during existence of relation of "physician" and "patient" (Code Iowa 1924, § 11263).

Privilege as to communications between patient and physician under Code Iowa 1924, § 11263, extends only to facts coming to physician's knowledge during existence of relation of physician and patient, and physician may testify to facts observed or learned as to person's condition before such relation existed, or after it had ceased to exist; a "patient" being a person under medical or surgical treatment, and a "physician" being one who practices the art of healing disease and of preserving health.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Patient; Physician.]

3. Witnesses ⬤185—Statute relating to privileged communications between patient and physician, being in derogation of common law, should be strictly construed (Code Iowa 1924, § 11263).

Code Iowa 1924, § 11263, relating to privileged communications between physician and patient, being in derogation of common law, should not be construed to apply to matters of evidence not coming clearly within its provisions.

4. Witnesses ⬤212—Knowledge of physician, obtained as result of post mortem examination, held not to be "privileged communication" (Code Iowa 1924, § 11263).

Knowledge of physician, obtained as result of a post mortem examination, held not to be "privileged communication," within meaning of Code Iowa 1924, § 11263, and court erred in excluding physician's testimony concerning facts

*Rehearing denied June 7, 1928.

discovered in such examination, in action on policy of accident insurance.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Privileged Communication.]

In Error to the District Court of the United States for the Northern District of Iowa; George C. Scott, Judge.

Action by Freda Bergeron against the Travelers' Insurance Company of Hartford, Conn. Judgment for plaintiff, and defendant brings error. Reversed and remanded, with instructions.

Vail E. Purdy, of Sioux City, Iowa (J. C. Gleysteen and Snyder, Gleysteen, Purdy & Harper, all of Sioux City, Iowa, on the brief), for plaintiff in error.

David F. Loepp, of Sioux City, Iowa (Clay H. Jensen, of Sioux City, Iowa, on the brief), for defendant in error.

Before WALTER H. SANBORN and LEWIS, Circuit Judges, and PHILLIPS, District Judge.

PHILLIPS, District Judge. Freda Bergeron (hereinafter called plaintiff) brought this action against the Travelers' Insurance Company of Hartford, Conn., to recover upon a policy of accident insurance. This policy, among other things, provided that the insurance company would pay to the plaintiff, as beneficiary, the sum of $7,500 in the event the death of Lisle Bergeron, the insured, should be "effected directly and independently of all other causes, through external, violent, and accidental means." The pleadings presented the issue of whether the death of the insured resulted from accidental cause within the meaning of the policy.

Lisle Bergeron, the insured, for a period of six or seven years prior to April 7, 1925, had been accustomed to the moderate use of intoxicating liquor, commonly called gin, which he concocted himself. On April 7, 1925, after making some gin in his accustomed way, the insured drank about six ounces of such gin. A short time thereafter he became ill, collapsed, and passed into a state of coma. He remained unconscious until April 9th, when death ensued. The total alcoholic content of such gin was 45.60 per cent. Of this 5.23 per cent. was wood alcohol, and the balance grain alcohol. When the insured became stricken, Dr. P. E. Keefe, a duly licensed and regularly practicing physician and surgeon, was called to attend him. Dr. Keefe had the insured removed to St. Joseph's Hospital in Sioux City, Iowa, and there continued to treat the insured until his death.

At the trial, Dr. Keefe was called as a witness for the plaintiff. In answer to a hypothetical question, which recited the foregoing facts and other facts material to the inquiry, Dr. Keefe gave his opinion that the wood alcohol contained in the drink of gin was sufficient, independently of all other causes, to cause the death of the insured, and that the death of the insured was caused by "acute toxic poisoning, apparently wood alcohol."

Dr. A. C. Starry, a duly licensed and practicing physician, was called to testify in behalf of the defendant. He testified that he was the pathologist at St. Joseph's Hospital at Sioux City, Iowa, and had under his charge and supervision the clinical laboratory of the hospital in which clinical laboratory work was done for the patients at the hospital. Plaintiff showed that Dr. Keefe caused samples of the urine, of the blood, and of the spinal fluid of the insured, while the latter was a patient in the hospital, to be sent to the clinical laboratory for analysis, and that an analysis of each of such samples was made in the clinical laboratory under the supervision and direction of Dr. Starry.

Dr. Starry further testified that he did not see the insured during his last illness; that he made no examination of him to determine the cause of such illness prior to death, and had nothing to do with the treatment administered; that after the death of the insured, at the request of Dr. Keefe, he made an autopsy on the body of Lisle Bergeron; and that the purpose of such autopsy was to determine the cause of death.

The defendant then offered to show by the witness Dr. Starry facts discovered and ascertained by him from such post mortem examination. The plaintiff objected to this evidence upon the ground that it was a disclosure of a privileged communication between patient and physician, and inadmissible under the provisions of section 11263 of the 1924 Code of Iowa. The learned trial judge sustained this objection.

The defendant then made the following offer of proof:

"Mr. Purdy: The defendant now offers to prove, by the testimony of Dr. A. C. Starry, that in making the autopsy of the body of Lisle Bergeron he discovered that there was in the brain of said Lisle Bergeron, attached to the surface of the left thalamus and projecting into the right ventricle, a small tumor mass about the size of a small cherry, and that there was stretched over this tumor across the upper surface thereof a small blood vessel, the wall of which, ad-

25 F.(2d)—43½

jacent to the tumor, had become atrophied and weakened and made thinner, and that this blood vessel had ruptured at the point where it had so become weakened, and that as a result of said rupture a hemorrhage had occurred into the ventricles of the brain, and that as a result of said rupture there was—there were clots of blood in the left lateral ventricle, and the right lateral ventricle was filled with clotted blood, and the third and fourth ventricles were filled with blood; that the meninges contained a large amount of blood, and a large amount of clotted blood filled arachnoid spaces; that the condition so found resulted from said rupture, and was such as to be necessarily fatal; that no other cause for the death of said Lisle Bergeron was discovered in said post mortem examination; that the weakening and thinning out of the wall of said blood vessel adjacent to said tumor was detected by a microscopic examination of said blood vessel; that the tumor discovered was of a kind with which the growth is progressive, and was such that in time it must have necessarily resulted in the rupture of said blood vessel sooner or later; that the condition so discovered was discovered solely as a result of performing an autopsy in the usual manner, and without any information or knowledge on the part of the witness at the time of performing said autopsy of the prior condition of Mr. Bergeron before his death, and that the condition so discovered was such that in the opinion of the witness a fatal result from said condition would in his opinion have come about from said condition described no matter what other information he might have had relative to Lisle Bergeron during his lifetime, or during his last illness, and that in view of the condition so found in said autopsy death could not have resulted from any other cause than the tumor, the stretching of the blood vessel and weakening of its walls by the tumor and the rupture and hemorrhage resulting therefrom, and that if the said Lisle Bergeron prior to his death had been suffering from any other affliction or disease which might have caused his death, but of which no evidence was discovered on the autopsy, it is nevertheless in the opinion of the witness impossible for any doctor to say in view of the findings made on the autopsy that the conditions there discovered were not a part and a vital part of any of the cause or causes resulting in his death."

Like objection was made to the offer of proof. The court sustained this objection and the defendant duly excepted thereto.

The trial resulted in a verdict for the plaintiff for the sum of $8,362.50 and the costs of the action. Judgment was entered on the verdict, and this is a writ of error therefrom.

The insurance company assigns as error the ruling of the trial court rejecting the offer of proof above set out.

Section 11263, Code of Iowa 1924, provides:

"11263. *Communications in Professional Confidence.* No practicing attorney, counselor, physician, surgeon, or the stenographer or confidential clerk of any such person, who obtains such information by reason of his employment, minister of the gospel or priest of any denomination shall be allowed, in giving testimony, to disclose any confidential communication properly intrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline. Such prohibition shall not apply to cases where the party in whose favor the same is made waives the rights conferred."

[1] The privilege as to communications between patient and physician is purely statutory, there being no such privilege at common law. 5 Wigmore on Evidence (2d Ed.) § 2380. Statutes establishing such privilege have been adopted in many states. 5 Wigmore on Evidence (2d Ed.) § 2380, p. 202. The purpose of such statutes is to encourage the patient to make full disclosure to the physician, of all facts requisite for the latter to know in order to enable him to prescribe and administer proper treatment, by removing any fear on the part of the patient that the physician may thereafter make public such facts in giving testimony as a witness. The end which the statute purposes to attain is proper treatment of the patient. In re Bruendl's Will, 102 Wis. 45, 78 N. W. 169; Battis v. Chicago, R. I. & P. Ry. Co., 124 Iowa, 623, 100 N. W. 543, 545, 546; Jacobs v. City of Cedar Rapids, 181 Iowa, 407, 164 N. W. 891, 894; Clark v. State, ex rel. Sumney, 8 Kan. App. 782, 61 P. 814; State v. Dean (Utah) 254 P. 142, 143; Missouri Pac. Ry. Co. v. Castle (C. C. A. 8) 172 F. 841, 845.

In Bruendl's Will, supra, the court said:

"The purpose of the statute * * * is to facilitate and make safe full and confidential disclosure by patient to physician of all facts, circumstances, and symptoms, untrammeled by apprehension of their subsequent enforced disclosure and publication on the witness stand, to the end that the physi-cian may form a correct opinion, and be enabled safely and efficaciously to treat his patient."

In Battis v. Railway Co., supra, the court said:

"All will agree that the manifest purpose of this statute is to make it possible for every person to fully and freely consult with a physician, or submit himself to the examination of such physician, without anticipation or fear that the confidence reposed may be broken in upon by a subsequent examination of the physician as a witness in some form of legal proceeding. * * *

"If the physician assumes to advise or treat, he should be put in possession of all facts necessary or material to enable him to do so properly. If the patient acquiesce, he should have the right to, and should, communicate freely and fully, without fear of exposure or of having his confidence made common property. It was to this end that the statute was enacted."

Professor Wigmore, in his work on Evidence (2d Ed.) vol. 5, § 2382, says: "The confidence which is protected is that only which is given to a professional physician during a consultation with a view to a curative treatment; for it is that relation only which the law desires to facilitate."

Accordingly, it has been held that there is no privilege as to information acquired by a physician through the examination of a person unless such examination is made in contemplation of and as a preparation for professional treatment. 5 Wigmore on Evidence (2d Ed.) § 2383; Battis v. Ry. Co., supra, 124 Iowa, 623, 100 N. W. 546; Clark v. State, supra; James v. State, 124 Wis. 130, 102 N. W. 320; Union Pacific R. Co. v. Thomas (C. C. A. 8) 152 F. 365, 367; Blossi v. Chicago & N. W. Ry. Co., 144 Iowa, 697, 123 N. W. 360, 366, 26 L. R. A. (N. S.) 255.

In the case last cited, the court said:

"It is a mistake to assume that a physician cannot testify in any case to which his patient is a party. He is only forbidden to testify when he obtains information by reason of his employment to confidential communications intrusted to him in a professional character, and necessary and proper to enable him to discharge his duties."

[2] The privilege extends only to facts coming to the physician's knowledge during the existence of the relation of physician and patient, and a physician may testify to facts observed or learned as to a person's condition before such relation existed or after it had ceased to exist. Arnold v. Ft. Dodge,

D. M. & S. R. Co., 186 Iowa, 538, 173 N. W. 252, 255; McGinty v. Brotherhood of Railway Trainmen, 166 Wis. 83, 164 N. W. 249, 252; Cherpeski v. Great Northern Ry. Co., 128 Minn. 360, 150 N. W. 1091, 1092; 40 Cyc. 2382.

Whether facts coming to the knowledge of a physician as the result of an autopsical examination are privileged communications within the meaning of such statutes is a question upon which the authorities are not in accord. In the following cases, such facts have been held not to be privileged: Chadwick v. Beneficial Life Ins. Co., 54 Utah, 443, 181 P. 448; Borosich v. Metropolitan Life Ins. Co., 191 Wis. 239, 210 N. W. 829; Carmody v. Traction Co., 43 App. D. C. 245, Ann. Cas. 1916D, 706; Ossenkop v. State, 86 Neb. 539, 126 N. W. 72. See, also, 5 Wigmore on Evidence (2d Ed.) § 2382, at page 213. In the following cases, such facts have been held to be privileged: Thomas v. Byron Twp., 168 Mich. 593, 134 N. W. 1021, 38 L. R. A. (N. S.) 1186, Ann. Cas. 1913C, 686; Mathews v. Rex Health & Accident Ins. Co. (Ind. App.) 157 N. E. 467. The question apparently has never been decided by the Supreme Court of Iowa.

Webster defines a patient as "a person under medical or surgical treatment." "A 'physician' is one who practices the art of healing disease and of preserving health." State v. Beck, 21 R. I. 288, 291, 43 A. 366, 367; 21 R. C. L. p. 352, § 2. The relation of physician and patient arises when the professional service of the physician is accepted by the patient for the purpose of treatment. Battis v. Ry. Co., 124 Iowa, 623, 100 N. W. 543, 546; Peterson v. Phelps, 123 Minn. 319, 143 N. W. 793, Ann. Cas. 1915A, 257; 21 R. C. L. p. 375, 376, § 22. [3, 4] A deceased body is not a patient. The relation of physician and patient ends when the death of the patient ensues. To hold that facts discovered through an autopsy are privileged communications within the meaning of the statute will not effectuate what we conceive to be its manifest purpose, namely, to obtain full disclosure to the physician in order to enable him to properly treat the patient. Treatment cannot avail after death. On the other hand, to hold that facts obtained by a physician through an autopsy are not privileged communications will not,

in our opinion, in any wise prevent the accomplishment of the purpose for which the statute was enacted. The foregoing must be true, unless it can be said that a sick person will be deterred from calling a physician because of fear that, if death ensues, such physician will probably perform an autopsy and disclose the facts obtained through such autopsy. We think it altogether unlikely that such a fear would deter a sick person from securing the services of a physician. As a matter of fact, an autopsy is much less likely to follow in cases where the deceased person has had the services of a physician during his last illness. Where the deceased person has no physician during such illness, the public authorities are more likely to require an autopsy, and facts disclosed at an autopsy held at the instance of the public authorities are of course not privileged. It follows that facts obtained at an autopsy are neither within the letter nor the spirit of the statute; they are not within the letter because they are obtained after the relation has ceased; they are not within the spirit because keeping them secret will not in any wise accomplish the purpose for which the statute was enacted. This statute is in derogation of common law. In many cases it will close the door to the best possible evidence on the issue of fact presented for determination. It should not, therefore, be construed to apply to matters of evidence not coming clearly within its provisions. Missouri Pac. Ry. Co. v. Castle (C. C. A. 8) 172 F. 841, 845.

Of course, where the physician who performs the autopsy was the physician of the deceased person during the latter's lifetime, such physician, in disclosing the facts obtained through the autopsy, must not be permitted either directly or indirectly to disclose facts which came to him when the professional relation existed. In this case, no such danger exists. Dr. Starry obtained no facts during the lifetime of Bergeron. The proffered testimony related solely to facts which Starry discovered through the autopsy. In our opinion the trial court erred in refusing to admit Starry's testimony concerning such facts.

The cause is reversed and remanded, with instructions to grant the insurance company a new trial.