C. CAPERS SMITH, PLAINTIFF v. STATE OF NORTH CAROLINA, JAMES HOLSHOUSER, GOVERNOR; JOE K. BYRD, CHAIRMAN, STATE BOARD OF MENTAL HEALTH; RALPH SCOTT, CHAIRMAN, ADVISORY BUDGET COMMISSION; DAVID T. FLAHERTY, INDIVIDUALLY AND AS SECRETARY OF HUMAN RESOURCES; N. P. ZARZAR, INDIVIDUALLY AND AS COMMISSIONER, DEPARTMENT OF MENTAL HEALTH; TREVOR WILLIAMS, INDIVIDUALLY AND AS SUPERINTENDENT OF BROUGHTON HOSPITAL, DEFENDANTS

No. 61

(Filed 4 September 1979)

1. **Master and Servant § 10.2; State § 12— superintendent of State hospital—discharge by Secretary of Human Resources proper**

   When a State government agency is transferred to a new department by a "type II transfer," G.S. 143A-6(b) provides that the management function of the agency, which includes staffing pursuant to G.S. 143A-6(c), shall be performed not only under the "supervision" but also the "direction" of the head of the principal department; therefore, the Secretary of Human Resources had the authority to dismiss plaintiff as superintendent of Broughton Hospital before his six year term expired, and it was not required that he be dismissed by the State Board of Mental Health. Furthermore, the transfer of the power to dismiss from the State Board to the Department of Human Resources did not impair plaintiff's contract since his contract was not with the agency which appointed him but was with the State, and the transfer made no changes in either the obligations of the parties or the remedies available to plaintiff in enforcing his agreement.

2. **Master and Servant § 10.2; State § 12; Evidence § 14— superintendent of State hospital— superior's order to produce tape—disobedience as cause for dismissal—physician-patient privilege inapplicable**

   In an action by plaintiff to recover damages for wrongful discharge from his position as superintendent of Broughton Hospital, plaintiff's refusal to comply with a lawful and reasonable order of his superior to turn over a tape of a

meeting of the Credentials Committee of the Hospital constituted "cause" for plaintiff's dismissal, and the information contained on the tape did not come within the protection of the doctor-patient privilege established by G.S. 8-53 and G.S. 122-8.1, since the information on the tape did not pertain to treatment of the patients but related basically the facts included in the death certificates of the patients which were a matter of public record; G.S. 122-8.1 was not intended to allow a superintendent of a State hospital to refuse to turn over information to his superiors in the Department of Human Resources attempting to investigate complaints of improprieties or neglect on the part of members of the hospital medical staff; and the physician-patient privilege does not extend to information gathered by observations made after the patient's death.

Justice BROCK did not participate in the consideration or decision of this case.

APPEAL by the State of North Carolina under G.S. 30(2) from the decision of the Court of Appeals, reported in 36 N.C. App. 307, 244 S.E. 2d 161 (1978), which reversed the judgment of *Snepp, J.,* granting the State's motion for a directed verdict at the 14 February 1977 session of the Superior Court of Burke, docketed and argued as Case No. 41 at the Fall Term 1978.

Action for damages for wrongful discharge.

On 1 October 1970 plaintiff, Dr. C. Capers Smith, a medical doctor trained in psychiatry, was duly appointed Superintendent of Broughton Hospital (Broughton), one of the State's hospitals for the mentally disordered. The appointment, made pursuant to G.S. 122-25 (repealed by 1973 N.C. Sess. Laws, ch. 476, § 133), was for six years. On 30 April 1973, under circumstances to be discussed later, plaintiff was dismissed as Superintendent. On 4 May 1973, pursuant to G.S. 122-1.1 (repealed by 1973 Sess. Laws, ch. 476, § 133), plaintiff served upon the Governor and the Chairman of the Advisory Budget Commission a claim for severance pay. In the claim plaintiff stated he would consider their failure to honor his demand by a given date "as a rejection and denial of this claim by all parties." When no action was taken on the claim, plaintiff filed this action for damages. Had he been permitted to serve the remainder of his term as Superintendent, plaintiff would have received compensation totaling $169,455.59.

When the case was called for trial, plaintiff took a voluntary dismissal without prejudice as to defendant Joe K. Byrd.

Plaintiff's evidence consisted of his own testimony, that of Doctors Robert S. Dawson and Trevor G. Williams, and a number

of exhibits, including the transcript of a tape recording of the meeting of the Broughton Credentials Committee held on 16 April 1973 (Plaintiff's Exhibit 4). This evidence — summarized except when quoted — is stated below as chronologically as possible.

The controversy which led to Dr. Smith's dismissal began with the failure of Dr. M. J. Short, the staff doctor on call, to come to the hospital to certify the deaths of two patients, Virginia Evans and William Henry Ward, after being notified of their deaths by the nurse on duty. Evans died during the early morning hours of 10 February 1973; Ward, about 3:00 a.m. on 11 February 1973. Dr. Smith learned of these two incidents on Monday, 12 February 1973, when he received reports detailing the happenings of the previous weekend from Mrs. Virl Lester and Mrs. Ruby Setzer, the head nurses on the respective wards. These reports are not in the record, but Mrs. Lester later gave the following version of the events which occurred after Ward's death:

At 3:15 a.m. on February 11th while Mrs. Lester was on "C" ward, she was informed that a patient, William Ward, had been found in another unit "slumped in the bathroom not breathing." When she arrived at the other unit around 3:30 a.m., she determined that Ward was dead and began searching for his family's telephone number. It was customary for the nurses to locate the number before calling the doctor on duty so that he could notify the family without having to wait at the hospital or make an additional trip.

After searching unsuccessfully for the telephone number of Ward's family, Mrs. Lester called Dr. Short at 4:10 a.m. She informed him of the situation and he instructed her to place the body on a bed in a single room and told her he would "see him in the morning." She was "so startled by that statement that [she] figured [she] had not really awakened him . . . so [she] said, 'Dr. Short, did you hear me say that this patient expired at 3:05 a.m. and now it is only 4:10 a.m. and you ordered the man be placed on a bed and not in the morgue?' . . . [Dr. Short] replied, 'That is right, I'll see him in the morning.'"

Following Dr. Short's instructions, Mrs. Lester helped attendants carry the body to a single room. She then wrote up the incident in the report book on "U" ward and later reported it to her

supervisor. When she completed her shift at 7:15 a.m., Dr. Short had still not seen the patient.

On the night before Dr. Short have given substantially identical instructions to the nurse who called to inform him of the death of Virginia Evans.

Dr. Smith received the nurses' reports on the two deaths in a staff meeting on February 12th at which Dr. Short was present. Dr. Smith informed the staff of the manner in which the doctor on duty had responded to the nurse's call and emphasized that this was not the way he would have expected any doctor at Broughton to have responded. He told the staff that in the future whenever a doctor on duty was notified of a death, he was "to come." Dr. Smith said he spoke generally without mentioning Dr. Short's name "so there would not be any direct confrontation." Having done so, he felt he had "adequately addressed the problem."

Sometime before February 10th, "hot lines" were installed connecting Broughton and the State's other mental institutions with the office of the Secretary of Human Resources so that employees "who had problems" could contact the Secretary's office directly. The Secretary had given notice that no employee who used the line was to be "harassed, fired, or demoted, or in any way intimidated because of the use of that telephone service."

After receiving several hot-line calls from hospital employees about the manner in which the deaths of Evans and Ward had been handled, Secretary Flaherty sent his representative, Mr. Bill White, to Broughton to investigate. White arrived at the hospital about 8:00 p.m. on 13 April 1973. Bob Cox, a hospital policeman, recognized him as an assistant to Secretary Flaherty and, at his request, escorted him through the alcoholic and neuroscience wards, including "U" ward. White spoke casually and generally with the patients until Johnny Wilson, an attendant, called him aside for a private talk.

Cox later informed his superior, Chief of Police Berryhill, of White's visit. Berryhill then told Dr. Smith someone from Secretary Flaherty's office had "come in the night" to check on the deaths which had occurred on February 10th and 11th.

Dr. Smith decided that if Dr. Short's professional conduct was to be questioned "outside," it should first be appraised by the hospital's Credentials Committee, a standing committee appointed by the Superintendent from Broughton's active medical staff. One of the duties of this Committee was to investigate any reported breach of ethics. After discussing the matter with Dr. Short, plaintiff asked Dr. McCall, the chairman of the Committee, to call a meeting. When he refused, Dr. Smith called the meeting himself.

The Committee met in plaintiff's office on the morning of 16 April 1973. Present were Dr. Mike McCall, Dr. Norman Boyer, Dr. Robert Darrow, Mrs. John Reece, Dr. S. M. Shah-Khan, Dr. Smith and his secretary, Mrs. Hubbard. Ordinarily, Mrs. Hubbard took the minutes in shorthand, but on this occasion Dr. McCall "brought [a] tape recorder and put it in the middle of the table." As the morning progressed, discussions "became very heated." One person "reached over several times and turned off the tape and asked that he not be recorded." When the secretary later attemped to transcribe the tape, she found portions of it unintelligible.

In brief summary, the tape as transcribed tended to show:

Dr. Smith first reviewed the events leading up to the meeting. He then told the six Committee members present that he believed Dr. Short's failure to repond to the nurse's call to come to the hospital on the nights of February 10th and 11th would soon be questioned officially. If so, he thought that "the medical staff should be of one thought" about the matter. He stated that the purpose of the meeting was to determine whether Dr. Short's conduct had met professional standards. Dr. Smith said he had no idea who was responsible for the investigation, but he did know that Broughton had again been "put on the spot by the Secretary of Human Resource's night riders, as he had come to call them." Then, after praising Dr. Short's work on behalf of Broughton during the preceding two years, he asked Dr. Short "to explain the situation as it existed at that time."

Dr. Short said that when the nurse called him at 4:00 a.m., she told him Ward had been found dead at 3:05 a.m. and that they had been searching unsuccessfully since then for information as to the whereabouts of his family. Relying upon "the nurse's com-

petence in recognizing a dead person," he decided to wait until relatives had been found before pronouncing the patient dead. None were found until sometime the next day. As to the patient Evans, all Dr. Short could recall was that he had to go to the morgue to pronounce her dead. Dr. Short expressed considerable resentment that he should be called upon to justify his professional conduct because of Mr. White's visit and suggested that if this is "an example of the supervision administration that will be coming to Broughton [it would be] an untenable place to practice." He also warned that there "were other harassments coming through the same channels."

Dr. Short's comments caused Dr. McCall to say that he was "very much concerned" lest they lose Dr. Short. Dr. Shah-Khan suspected that there were "informers on the staff of Broughton Hospital" who were harming professional reputations by innuendo. The Committee members also expressed resentment that an investigation of a staff doctor should be instigated without the knowledge of the superintendent.

After much discussion as to just how soon a physician should respond to a call to pronounce a patient dead, the consensus seemed to be that he should respond as quickly as *in his judgment* was feasible. It was also noted that since Dr. Smith had talked to the staff on February 12th, no doctor on call had failed to respond promptly. Eventually, a "resolution" was assembled piecemeal from the floor. It provided approximately as follows:

The deaths of Virginia Evans and William Henry Ward were due to natural causes to which no negligence on the part of any Broughton doctor contributed. No one suffered any injury, loss, damage, or hurt feelings because of the delay in certifying their deaths. The attending physician, Dr. M. J. Short, handled all problems properly; and there is no evidence of neglect on his part.

This resolution was passed unanimously.

Immediately thereafter Dr. McCall asked if the Committee wanted to hear what he knew about the Evans case. Dr. Smith replied that they did. Dr. McCall then reported that on the night of Virginia Evans' death the ward nurse had telephoned him at home to say that when she called Dr. Short he had told her to leave the body on the ward; that she was reluctant to do so

because the shift would soon change and they were not accustomed to leaving bodies on the wards; that this patient had an interested family, who had left the ward only 45 minutes before; and that she was uncertain what to do. Dr. McCall told her to call Dr. Shannon and see if he would respond; that if she could not reach him, she should either move the body to the morgue or call him back. Dr. McCall said she did not call him back and that he next heard about the incident when Dr. Smith reported the matter at the staff meeting the next morning.

After Dr. McCall's statement the Committee renewed its discussion of whether Broughton had "a stated rule that physicians go and examine the body of a person thought to be dead or dying," and—if not—whether there should be one. Dr. Smith said he thought there should be such a rule. In the midst of a heated discussion Dr. Robert Darrow produced the Hospital Procedure Book which contained this directive: "When a patient stops breathing, notify the supervisor and doctor. . . . The doctor should pronounce the patient dead within a short time after breathing has ceased, fill out the ward card and death package, giving information as requested on the outside of the package."

The discussion which this find engendered was terminated by the need to call the witnesses whom Dr. Smith had instructed to be present and who were waiting outside—Mrs. Setzer and Mrs. Lester, ward nurses, John Wilson and Faye Poteat, attendants, Mrs. Boyles, a telephone operator, and Bobby Cox, security officer. Although the record discloses that all these persons attended the inquiry on April 16th and were questioned, the transcript introduced in evidence (Exhibit 4) contains only the statements of Cox and Lester.

Cox gave the Committee the same information he had reported to Chief Berryhill. He was then confronted with such questions as "Do you not think it was improper conduct on your part to have taken somebody to the patients' bedroom in the middle of the night? Did you think you were in charge of the hospital at that particular time? Why did you take it upon yourself to admit somebody without asking permission from the Superintendent or your supervisor? Don't you think this was improper conduct on your part? Was any question asked or any statement made by

---

**Smith v. State**

---

any attendant, patient or by Mr. White which referred to any physician on our staff?"

The substance of Cox's answers was that he escorted Mr. White to the wards at 8:00 p.m. — not in the middle of the night; that he recognized Mr. White as Secretary Flaherty's assistant and therefore he didn't think his conduct was improper; and that he had heard no reference that night to any hospital physician.

After Mrs. Lester gave the Committee her version of the call to Dr. Short, she was asked if she had talked to anybody outside the hospital about the incident. When she answered NO, the Committee wanted to know how such "confidential information" became known. Mrs. Lester replied that she understood the "word went over the town through the funeral home." Several of the doctors then suggested that she had been guilty of "very poor nursing practice" in permitting Ward's body to remain in the bathroom while she hunted for telephone numbers, and that she had applied a "double standard" in criticizing Dr. Short for leaving the body on the bed for four hours. Mrs. Lester left the meeting in tears, and Dr. Smith went out to console her.*

After receiving information that certain employees "had been harassed and intimidated" at the meeting of the Credentials Committee, Dr. Trevor Williams, the Western Regional Commissioner of Mental Health and plaintiff's immediate superior, visited him on April 19th and asked for the tapes of the meeting. He explained that they needed the tapes (1) to ascertain the circumstances surrounding the deaths of Evans and Ward, and (2) to determine whether hospital employees appearing before the Committee had been harassed. Plaintiff refused to turn over the tapes on the ground that information therein was protected by the doctor-patient privilege. Dr. Williams told Dr. Smith his refusal would be "considered as insubordinate action."

On April 25th Dr. Williams went to plaintiff's office again. He informed Dr. Smith that Dr. Zarzar, acting Commissioner of Mental Health, had sent him for the tapes, and that plaintiff could either deliver them or submit his resignation. Plaintiff again refused to deliver the tapes and claimed that Dr. Zarzar had no

---

*In a deposition filed in the summary-judgment hearings, Mrs. Lester said that at no time did Dr. Smith ever harass or intimidate her; and that "he was his usual kind, gracious self."

authority to dismiss him. On April 27th Dr. Williams advised plaintiff by letter that because of his refusal to release the tapes he was dismissed as of 11 May 1973. On April 30th the Secretary of Human Resources sent plaintiff a telegram dismissing him as of that day.

At the conclusion of plaintiff's evidence, the trial court granted defendants' motion for a directed verdict. The Court of Appeals reversed as to the State of North Carolina, and the State appealed.

*Hatcher, Sitton, Powell & Settlemyer by Claude S. Sitton, and James J. Booker, for plaintiff.*

*Rufus L. Edmisten, Attorney General, and William F. O'Connell, Special Deputy Attorney General, for the State.*

SHARP, Chief Justice.[1]

This is the second time this case has come before this Court for review. *Smith v. State*, 289 N.C. 303, 222 S.E. 2d 412 (1976). Plaintiff's original complaint was filed 24 July 1973 in Burke County Superior Court. Defendants moved to dismiss the action pursuant to G.S. 1A-1, Rule 12(b) on the grounds that sovereign immunity barred the suit against the State and also against the individual defendants acting in their official capacities. The trial judge denied the motion and defendants appealed. We held that the doctrine of sovereign immunity was not a bar to an action against the State for breach of a duly authorized State contract, but noted that any judgment would be uncollectible in the absence of a legislative appropriation. In our first decision we carefully pointed out that we were expressing no opinion as to the merits of the controversy between Dr. Smith and the State. 289 N.C. at 322, 222 S.E. 2d at 424.

The merits of that dispute are now before us. Plaintiff's amended complaint was filed 6 May 1976. As his first claim for relief plaintiff alleges that the State of North Carolina breached his contract of employment by dismissing him without cause or authority. As damages he asks for the balance of the salary to which he would have been entitled under the contract. In his sec-

---

1. This opinion was written in accordance with the Court's decision made prior to Chief Justice Sharp's retirement and was adopted by the Court and ordered filed after she retired.

ond claim for relief plaintiff alleges that the individual defendants — David Flaherty, N. P. Zarzar, and Trevor Williams — caused him to be discharged in a manner "designed to embarrass and humiliate him" and which defamed him in his profession. He also alleged that these defendants knew it would be "impossible for the plaintiff to obtain other employment of [a] comparable nature" because of his age and physical condition. Finally, plaintiff alleges that the actions of defendant Flaherty were "motivated by malicious and corrupt intent" thus entitling him to punitive damages.

At the conclusion of plaintiff's evidence the trial judge allowed motions (1) by defendants James Holshouser and Ralph Scott for judgment on the pleadings under Rule 12(c) and (2) by all other defendants for a directed verdict under Rule 50(a). He also denied plaintiff's motion for summary judgment, which, along with defendants' motion for summary judgment, had been filed and heard at length prior to trial. The facts disclosed by the deposition and exhibits which the court considered on these motions do not differ materially from the evidence plaintiff adduced at trial. Plaintiff took no exceptions to the dismissal of his action against Holshouser and Scott. His appeal to the Court of Appeals was from the trial court's denial of his motion for summary judgment and its grant of a directed verdict in favor of the other defendants.

The Court of Appeals concluded that only the State Board of Mental Health had the authority to dismiss plaintiff from his job. Because all the evidence showed that plaintiff was discharged by the Secretary of Human Resources and not by the Board of Mental Health, the Court held that the trial judge should have allowed plaintiff's motion for summary judgment against the State. Plaintiff's exception to the allowance of a directed verdict in favor of the individual defendants was deemed abandoned for failure to argue the assignment of error on appeal. *Smith v. State*, 36 N.C. App. 307, 244 S.E. 2d 161 (1978).

The State's right to a directed verdict at the close of plaintiff's evidence turns on two questions of law: (1) Was the Secretary of the Department of Human Resources authorized by statute to dismiss plaintiff and (2) did cause to dismiss plaintiff exist as a matter of law? The trial court's entry of a directed ver-

dict for the State can be sustained only if the answer to both of these questions is YES. If a directed verdict in the State's favor was proper, it follows that the trial court was also correct in denying plaintiff's motion for summary judgment since the evidence he presented at trial tended to show substantially the same facts disclosed by the depositions the court considered at the hearing upon the motions for summary judgment.

Plaintiff was employed by the State in 1970 pursuant to G.S. 122-25 (repealed by 1973 N.C. Sess. Laws ch. 467, § 133), which authorized the Commissioner of Mental Health to appoint a medical superintendent for each State hospital for a term of six years. Under G.S. 122-1.1, also in effect at that time, the State Board of Mental Health by and with the approval of the Governor could terminate "for cause" the services of any employee appointed for a specific length of time.

[1] We consider first plaintiff's contention that even if there was cause for his dismissal, it was improper because he was discharged by the Secretary of Human Resources.

As part of a reorganization of State government in 1971, the State Board of Mental Health was transferred to the Department of Human Resources. The vehicle for this change was the Executive Organization Act of 1971 which incorporated the Board of Mental Health into the Department of Human Resources by means of a "type II transfer." The relevant statute reads as follows:

> § 143A-6. Types of transfers.—(a) Under this Chapter, a type I transfer means the transferring of all or part of an existing agency to a principal department established by this Chapter. When all or part of an agency is transferred to a principal department under a type I transfer, its statutory authority, powers, duties, and functions, records, personnel, property, unexpended balances of appropriations, allocations or other funds, including the functions of budgeting and purchasing, are transferred to the principal department.
>
> When any agency, or part thereof, is transferred by a type I transfer to a principal department under the provisions of this Chapter, all its prescribed powers, duties, and functions, including but not limited to rule making, regula-

tion, licensing, and promulgation of rules, rates, regulations, and standards, and the rendering of findings, orders, and adjudications are transferred to the head of the principal department into which the agency, or part thereof, has been transferred.

(b) Under this Chapter, a type II transfer means the transferring intact of an existing agency, or part thereof, to a principal department established by this Chapter. When any agency, or part thereof, is transferred to a principal department under a type II transfer, that agency, or part thereof, shall be administered under the direction and supervision of that principal department, but shall exercise all its prescribed statutory powers independently of the head of the principal department, except that under a type II transfer the management functions of any transferred agency, or part thereof, shall be performed under the direction and supervision of the head of the principal department.

(c) Whenever the term "management functions" is used it shall mean planning, organizing, staffing, directing, coordinating, reporting and budgeting.

Plaintiff argues that this statute leaves untouched the power of the State Board of Mental Health to fire employees hired for a term, and points out that the statute makes no specific mention of the power to dismiss. The State contends that the power to fire a disobedient employee is implicit in the meaning of the term "management functions" as used in G.S. 143A-6, and notes that the Secretary is explicitly given control over "staffing." The Court of Appeals attempted to strike a balance between these two positions. As it interpreted G.S. 143A-6(b), the State Board of Mental Health kept all of its statutory powers after the transfer, including hiring and firing, and the Secretary of Human Resources was only given the power to *supervise* the Board's exercise of those functions. *Smith v. State*, 36 N.C. App. at 310-11, 244 S.E. 2d at 163.

We reject the Court of Appeals' construction as being inconsistent with both the language and purpose of the statute. When an agency is transferred to a new department by a "type II transfer," G.S. 143A-6(b) provides that the management functions of the agency shall be performed not only under the "supervision"

but also the "direction" of the head of the principal department. The word "direction" refers to the "act of governing; management; superintendence; a guiding or authoritative instruction." Black's Law Dictionary (Rev. 4th ed. 1968). Clearly, the legislature intended for the head of the Department of Human Resources to have final authority over all management functions, not merely "supervisory" power. To hold that a transferred agency could exercise all of its former powers after the reorganization, subject only to some undefined supervision by the head of the new department, would treat the transfer as merely a change in name, thus defeating the purpose of the Organization Act.

G.S. 143A-6(c) defines the term "management functions" to mean "planning, organizing, staffing, directing, coordinating, reporting and budgeting." Even if this definition was intended to be inclusive, an issue we need not now decide, the power to fire clearly falls within its scope since the Act expressly gives the head of the principal department power over "staffing."

This construction is supported by the Act's legislative history. On 3 November 1970 the electorate approved a constitutional amendment to reduce the number of the State's principal administrative departments to not more than twenty-five by 1 July 1975. N.C. Const. art. 3, § 11. This process began with the enactment of the Executive Organization Act of 1971, N.C. Gen. Stat. ch. 143A (1978), and continued with passage of the Executive Organization Act of 1973. N.C. Gen. Stat. ch. 143B (1978).

In May 1970 the Governor appointed a Committee on State Government Reorganization to Review the work of a 1969 study commission and to make proposals for implementing the amendment to the 1971 General Assembly. Report of the Governor's Committee on State Government Reorganization at 4 (1971) [hereinafter Report]. Because of the time limitations imposed on the Committee, it recognized that major statutory revisions would be impractical. Report at 5. It therefore proposed that some agencies be transferred to the newly created departments with part of their statutory powers intact. Report at 12.

Under one type of transfer, which the Committee labeled a "type I transfer," all of the agency's powers and functions would be transferred to the new department. Report at 12. The Committee suggested that a "second type of transfer (type 2) . . . be used

to transfer agencies which have policy making boards and commissions. The principal department [would have] the authority to direct and supervise all *budgeting, purchasing and related management functions,* but the agency [would] continue to exercise independently some of its primary statutory functions pending subsequent review and legislation." Report at 12. (Emphasis added.) The substance of this proposal was adopted by the legislature and is now codified as G.S. 143A-6.

In providing for a "type II transfer," the legislature clearly intended to distinguish between the rule-making or policy functions of a transferred agency and its management functions. Under the statutory scheme established by the Act, the former functions were to remain in control of the transferred agency while the latter were to become the sole province of the heads of the principal departments. This would allow the new departments to gain administrative experience and expertise pending the ultimate transfer of policy-making powers.[2] Report at 11. With this distinction in mind it is clear that the power to fire a disobedient employee must be considered an aspect of management rather than an aspect of policy-making.

Plaintiff also argues that a transfer of the power to dismiss him from the Board to another agency would constitute an impairment of his contract. He cites no authority in support of this contention other than the provision of the United States Constitution which prohibits a state from passing any law "impairing the obligations of contracts." U.S. Const. art I, § 10.

It has long been established that the Contract Clause limits the power of the states to modify their own contracts as well as to regulate those between private parties, and that rights under such contracts cannot be defeated by subsequent legislation. *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17, 52 L.Ed. 2d 92, 106, 97 S.Ct. 1505, 1515 (1977); *Hans v. Louisiana,* 134 U.S. 1, 33 L.Ed. 842, 10 S.Ct. 504 (1890); *Oglesby v. Adams,* 268 N.C. 272, 150 S.E. 2d 383 (1966). Not every modification of a contractual promise, however, impairs the obligation of contract. *El Paso v. Simmons,* 379 U.S. 497, 506-07, 13 L.Ed. 2d 446, 453-54, 85 S.Ct. 577, 582-83 (1965).

---

2. *See, e.g.,* G.S. 143B-138(b)(8) which transferred to the Department of Human Resources all the "powers, duties and obligations" previously vested in the State Board of Mental Health. This statute became effective 1 July 1973.

The transfer of the power to dismiss from the State Board to the Department of Human Resources makes no change in either the obligations of the parties or the remedies available to plaintiff in enforcing his agreement. Plaintiff's contract of employment was not with the agency which appointed him but with the State. *Smith v. State*, 289 N.C. at 332, 222 S.E. 2d at 431. The essential terms of that contract — duration, dismissal for cause, and salary — remain unaffected by any shift of the power to fire from one agency of the State to another.

Having determined that the Executive Organization Act of 1971 transferred the power to dismiss Dr. Smith to the Secretary of Human Resources and that this change did not constitute an "impairment" of his contract, the next question is whether there was "cause" for his dismissal. Because the material facts are undisputed, that issue is a question of law for the court. *Craig v. Thompson*, 244 S.W. 2d 37, 41 (Mo. 1951).

[2] On 25 April 1973 Dr. Trevor Williams, a licensed physician and plaintiff's immediate superior, ordered him to turn over the tapes of the Credentials Committee meeting or be dismissed. Dr. Williams explained that he required the tapes in his investigation of the circumstances surrounding the two deaths at Broughton Hospital. This was the third such order plaintiff had received from his superiors. Plaintiff again refused and was subsequently dismissed.

In every contract of employment it is implied that the employee will obey the rules, orders, and instructions of his employer so long as those orders are lawful and reasonable. *Joseph E. Seagram & Sons, Inc. v. Bynum*, 191 F. 2d 5, 17 (8th Cir. 1951); *NLRB v. Montgomery Ward & Co.*, 157 F. 2d 486, 496 (8th Cir. 1946); *Craig v. Thompson*, 244 S.W. 2d 37, 41 (Mo. 1951); *Borden v. Day*, 197 Okl. 110, 111, 168 P. 2d 646, 648 (1946); 53 Am. Jur. 2d *Master and Servant* §§ 54, 98 (1970). *See also, Ivey v. Cotton Mills*, 143 N.C. 189, 195, 55 S.E. 613, 615 (1906). When an employee intentionally disobeys an employer's lawful instructions, his actions constitute "cause" for his dismissal. *Chemvet Laboratories, Inc. v. NLRB*, 497 F. 2d 445, 452 (8th Cir. 1974); *NLRB v. Consolidated Diesel Electric Co.*, 469 F. 2d 1016, 1025 (4th Cir. 1972); *Avondale Mills v. Burnett*, 268 Ala. 82, 86, 106 So. 2d 885, 888 (1958); *Craig v. Thompson*, 244 S.W. 2d 37, 41 (Mo.

1951); *Porter v. Pepsi-Cola Bottling Co.*, 247 S.C. 370, 375, 147 S.E. 2d 620, 622, *cert. denied*, 385 U.S. 827, 17 L.Ed. 2d 63, 87 S.Ct. 61 (1966). *See also, Haynes v. Railway*, 252 N.C. 391, 398, 113 S.E. 2d 906, 911 (1960).

Plaintiff admits that he disobeyed a direct order from a superior. He argues, however, that the order was unlawful and unreasonable in that it required him to violate the doctor-patient privilege.

The transcript of the tape which recorded the meeting of the Credentials Committee was introduced in evidence at the trial and included in the record on appeal. As indicated in the preliminary statement of facts, the discussion centered at first on the circumstances under which the two bodies were discovered and the response of hospital personnel to the deaths. Later, when the Committee interviewed Mrs. Lester and the security guard, its attention seemed directed towards transferring blame for Dr. Short's failure to respond to the ward nurse and attempting to discover who had used the hot line to report the incidents to the Secretary's office. We note that the tape contains no discussion of the psychiatric or medical treatment the two deceased patients received at Broughton or of the conditions which led to their admission. It does mention the patients' names and contains Dr. Short's observation that Evans probably died of "myocardial infarction."

The doctor-patient privilege did not exist at common law. It is solely a creature of statute. The statute upon which plaintiff relies is G.S. 122-8.1. This statute applies specifically to physicians and other employees working in State hospitals. In 1973 it read in pertinent part as follows:

§ 122-8.1. Disclosure of information, records, etc.—No psychiatrist or any other officer, agent or employee of any of the institutions or hospitals under the management, control and supervision of the Department of Human Resources shall be required to disclose any information, record, report, case history or memorandum which may have been acquired, made or compiled in attending or treating an inmate or patient of said institutions or hospitals in a professional character, and which information, records, reports, case histories and memorandums were necessary in order to

prescribe for or to treat said inmate or patient or to do any act for him in a professional capacity unless a court of competent jurisdiction shall issue an order compelling such disclosure.

A similarly worded statute, G.S. 8-53,[3] sets out a privilege applicable to all physicians, whether privately or publicly employed. The accepted construction of G.S. 8-53, which is equally applicable to G.S. 122-8.1, is that it extends not only to information orally communicated by the patient but also to knowledge obtained by the physician through his own observation or examination while attending the patient in a professional capacity. *Sims v. Insurance Co.*, 257 N.C. 32, 37, 125 S.E. 2d 326, 330 (1962). Notwithstanding, the information contained on the tape of the Credentials Committee meeting does not come within the protection of the doctor-patient privilege established by G.S. 8-53 and 122-8.1.

Information acquired in the course of attending a patient is privileged only if it is "necessary in order to prescribe for or treat [the] inmate or patient or to do any act for him in a professional capacity." G.S. 122-8.1. After Evans and Ward died neither prescription nor treatment could be of any avail. The only "act in a professional capacity" performed for the patients after their deaths was the verification of death and the preparation of the medical certification as to cause of death required by G.S. 130-46(c). Pursuant to G.S. 130-46(b), this certificate is incorporated in the death certificate which is then filed as a public record in the office of the register of deeds. G.S. 130-64. The information which the physician is required to list on the medical certification — *i.e.*, the patient's name, the name of the attending physician, and the time, date and cause of death — does not differ materially from the information revealed about the two deceased patients at the meeting of the Credentials Committee. It is axiomatic that no privilege of confidentiality can attach to information which is already public.

Furthermore, we do not believe that G.S. 122-8.1 was intended to allow a superintendent of a State hospital to refuse to turn

---

3. At the time plaintiff was discharged from employment, G.S. 8-53 read as follows:

"No person, duly authorized to practice physic or surgery, shall be required to disclose any information which he may have acquired in attending a patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon: Provided, that the court, either at the trial or prior thereto, may compel such disclosure, if in his opinion the same is necessary to a proper administration of justice."

over information to his superiors in the Department of Human Resources attempting to investigate complaints of improprieties or neglect on the part of members of the hospital medical staff. While a patient may legitimately expect that confidential information will not be disclosed to the general public or to hospital personnel unconcerned with his treatment, his expectation of privacy does not extend to hospital administrators or employees who need the information in order to facilitate the patient's treatment or properly administer the hospital in accordance with approved standards.

That issue was addressed directly in *Klinge v. Lutheran Medical Center*, 518 S.W. 2d 157 (Mo. App. 1974). Plaintiff, a staff physician at a private hospital, brought an action to enjoin a staff committee at the hospital from examining the medical records of his patients to determine his competency to practice. Plaintiff argued that the physician-patient privilege prohibited the committee from examining the patients' records without their consent.

Construing a statute similar to our own, the court rejected these arguments. In holding that the doctor-patient privilege did not bar the staff committee from examining the patients' records, the court said:

> First, the policy behind the statute to encourage a patient to make full disclosure of his condition to his physician without fear of having the information used against him at a later date is not violated. The public's interest in the disclosure of the information to the internal staff of the hospital and in assuring proper medical and hospital care outweighs the patient's interest in concealment. It is doubtful if the privilege established by the statute was ever intended to apply to internal staff responsible for the welfare and health of the patients admitted to the hospital. This was at least recognized in *Benoit*, supra: "Hospital records are seen and copied by staff members and employees. The element of strict secrecy cannot be present under these circumstances." 431 S.W. at 109. . . .

> [A]n internal staff examination of patients' records of a staff physician under [these] circumstances . . . assures to the individual patient that degree of professional treatment to which he is entitled and is to the benefit and welfare of the

public that the hospital is conducted at a highly professional level. 518 S.W. 2d at 166-67.

*See also, Hyman v. Jewish Chronic Disease Hospital*, 15 N.Y. 2d 317, 206 N.E. 2d 338, 258 N.Y.S. 2d 397 (1965) (director of hospital corporation entitled to inspect patient records to investigate charges of improper experimentation on patients).

We further note that many jurisdictions have refused to extend the doctor-patient privilege to information gathered by observations made after the patient's death. *Gardner v. Meyers*, 491 F. 2d 1184 (8th Cir. 1974); *Travelers' Insurance Co. v. Bergeron*, 25 F. 2d 680 (8th Cir.), *cert. denied*, 278 U.S. 638, 73 L.Ed. 553, 49 S.Ct. 33 (1928) (autopsy not privileged); *Ferguson v. Quaker City Life Insurance Co.*, 146 A. 2d 580 (D.C. 1958); *Sprouse v. Magee*, 46 Idaho 622, 269 P. 993 (1928) (evidence obtained from an autopsy not privileged when capable of being segregated from information received as an attending physician); *Cross v. Equitable Life Assurance Society*, 228 Iowa 800, 293 N.W. 464 (1940).

The reason for this rule is aptly stated in *Travelers' Insurance Co. v. Bergeron*, supra: "A deceased body is not a patient. . . . To hold that facts discovered through an autopsy are privileged communications within the meaning of the statute will not effectuate what we conceive to be its manifest purpose, namely, to obtain full disclosure to the physician in order to enable him to properly treat the patient. Treatment cannot avail after death." 25 F. 2d at 683.

From the foregoing discussion it is quite clear that the controversial tape contained no confidential information about Evans and Ward, the two deceased patients, and that its delivery to Dr. Williams, Dr. Zarzar, or Commissioner Flaherty would have been neither unlawful nor a breach of medical ethics. It is equally apparent, however, that the tape did reveal certain embarrassing facts: (1) A doctor on call, in disregard of a well established procedure at Broughton, had twice declined to respond to a nurse's call to come to the hospital to verify the death of a patient. (2) Upon learning that the Secretary of Human Resources was investigating this omission of duty the Credentials Committee had hastened to absolve its colleague by a unanimous resolution finding that Dr. Short had handled all problems properly and that

there was no evidence of neglect of duty on his part. (3) Despite the policy against harassing employees who used the "hot line," the Credentials Committee gave both Mrs. Lester and Bobby Cox, employees suspected of having reported Dr. Short to Raleigh, "a hard time."

The tape also disclosed unanimous resentment against the hot line established by the Department of Human Resources for hospital employees to voice complaints and against the "grant of immunity" to those who used it.

Thus, it is all too apparent that the reason Dr. Smith withheld the tape was not to protect the doctor-patient relationship but to protect Dr. Short and other members of the hospital staff from embarrassing disclosures. This, of course, was not a legitimate reason for withholding the tape. To have done so was an unfortunate error of judgment for, as plaintiff conceded on cross-examination, all he had to do on 25 April 1973 to remain Superintendent of Broughton Hospital was to get the tape from his attorney and give it to Dr. Williams.

We hold that Dr. Williams' order to plaintiff to turn over the tape was both lawful and reasonable and that plaintiff's refusal to comply with that order constituted "cause" for his dismissal. The trial judge was therefore correct when he granted the State's motion for a directed verdict in plaintiff's action for breach of contract, and the Court of Appeals was in error when it held that plaintiff was entitled to summary judgment against the State.

As to the trial court's entry of directed verdicts in favor of the individual defendants in plaintiff's action for "professional defamation," the Court of Appeals correctly ruled that plaintiff abandoned his assignment of error to this ruling by failing to argue it or cite any authority supporting it in his brief filed in that Court. Rule 28(a), North Carolina Rules of Appellate Procedure.

The decision of the Court of Appeals directing the entry of summary judgment in favor of plaintiff in his action against the State is reversed, and the judgment of the Superior Court of Burke County is affirmed.

Reversed.

Justice BROCK did not participate in the consideration or decision of this case.