317 S.E.2d 718 (1984)
DAVIDSON AND JONES, INC.
v.
NORTH CAROLINA DEPARTMENT OF ADMINISTRATION and the University of North Carolina.
No. 8310SC693.
Court of Appeals of North Carolina.
July 17, 1984.
*719 Atty. Gen. Rufus L. Edmisten by Asst. Atty. Gen. Grayson G. Kelley, Raleigh, for defendants-appellants.
Griffin, Cochrane & Marshall by Luther P. Cochrane and Jennifer L. Wheatley, Atlanta, Ga., and Manning, Fulton & Skinner by Charles L. Fulton, Raleigh, for appellee-cross-appellant.
BRASWELL, Judge.
The parties executed a written building contract in 1975 for the construction by plaintiff of new stacks for books for the Wilson Library on the campus of the University of North Carolina at Chapel Hill. The contract contained a "rock clause," the interpretation and consequences of which form the core of this case.
After completion of construction and after exhaustion of the required statutory administrative procedures, the plaintiff brought this action in Superior Court alleging a breach of contract by defendants, whom we refer to as the State. In a nonjury hearing the trial court awarded damages to the plaintiff on the theory of breach of implied warranty for duration and delay-related expenses called "General Condition costs," additional unit price rock removal cost, late payment money, and interest on all items from 31 March 1976. The defendants appeal. The trial court denied any relief to plaintiff for additional compensation for home office overhead, and the plaintiff cross-appealed.
The ultimate facts essential to an understanding of the case follow.
*720 The contract was executed on 9 June 1975 for a project amount of $2,355,300.00. Plaintiff was given notice to proceed on 14 July 1975. The contract terms required the work to be completed in 540 calendar days after the notice to proceed. The invitation to bid allowed 730 days for completion.
Extensions of time totaling 240 days were given to the plaintiff which changed the completion date from 5 January 1977 to 2 September 1977. No liquidated damages were requested or assessed by the State.
Rock excavation was a part of the general requirements of the contract. Section 0230 of the contract reads as follows:
0230 ROCK EXCAVATION: (Applicable to various prime contracts)
Material to be excavated is assumed to be earth and materials that can be removed with hand tools. If rock is encountered within the limits of excavation, adjustments will be made in Contract on basis of unit price stated in Form of Proposal for all rock removed above or below these quantities:

1. The General Contractor shall include 800 cubic yards of rock excavation in his base bid.
* * * * * *
Rock Excavation shall be defined as boulders of 1/2 cubic yard or larger composed of hard granite or similar material requiring the use of rock drills and explosives for removal. (Emphasis added.)
The contract also states that "[u]nit prices are net and no profit or overhead shall be added or deducted when applying unit prices." (Emphasis added.)
The approved schedule of construction work showed rock excavation to be a critical activity for the plaintiff. On 28 July 1975, after obtaining permission, the plaintiff began the rock excavation. Plaintiff's schedule called for the excavation to be completed by 10 October 1975. By 30 September 1975 no less than 800 cubic yards of rock had been excavated. The excavation of all the rock was not completed until 30 April 1976. Time extensions of 146 days were granted to plaintiff for the overrun in rock excavation beyond the 800 cubic yards in the contract.
In its bid proposal and in the contract, the plaintiff quoted a unit price for rock excavation of $55.00 per cubic yard. The plaintiff subcontracted all rock excavation to T.H. Blake Contracting, Incorporated, through Thomas A. Blake, its major stockholder and president for "[t]he unit price [of] $50 per cubic yard." Mr. Blake testified:
I was to be paid on a per cubic yard basis for the amount of rock I moved and I have come up with a cost figure which I could live with and do it. I based my bid on how many yards I had to move. The type of rock mattered to me but I was to be paid for the amount of rock per yard that had to be excavated to get the project complete. Under my contract, I wanted to be paid whether I took out a thousand or three thousand yards of rock. When I submitted my bid to Davidson and Jones, I included my profit in the unit price. My profit margin was somewhere around 15 percent.
The court found as a fact that the plaintiff's "unit price of $55.00 per cubic yard was arrived at by taking the rock excavation subcontractor's cost per cubic yard ($50.00) and adding an administrative markup of ten percent ($5.00)."
The trial court found that the plaintiff, through its subcontractor Blake, actually removed 3,714 cubic yards of rock. This amount constituted more than a 400% overrun in rock quantity above the 800 cubic yards in the contract. In addition, the court stated that "[t]he magnitude of the overrun in rock excavation was not anticipated by the parties, nor was the overrun in Project time necessary to complete the work" anticipated.
Under Change Orders G-2 and G-4, which now form a part of the contract, the parties have stipulated that "the State paid for 3,300 cubic yards of rock removed at $55.00 per cubic yard." Change Order G-4, as approved on 25 March 1976, grew out of the plaintiff's request on 19 March 1976 for the payment of additional rock *721 excavation and several other construction items in the amount of $136,780.00. The last paragraph of Change Order G-4 reads:
Net amount to be paid to Davidson & Jones, Inc. for any and all rock excavation on this project to date plus payment for adjustment of all other construction caused thereby: $111,985.00.
On 7 May 1976 the plaintiff claimed additional compensation was due it for 50.5 cubic yards of rock required by the OSHA inspector to be excavated. This claim for $2,777.00 was rejected by the State.
After completion of the project plaintiff filed claims for equitable adjustment, requesting "$262,551.00 for the extra costs, duration expenses, inefficiency and interest costs" allegedly incurred because of the overrun in rock excavation. The parties have stipulated that "[e]xcept for such compensation as Davidson & Jones' claims is due under its Claims, Davidson & Jones has been paid the sums due it under the contract."
The trial court concluded that the plaintiff had not been paid for 414 cubic yards of rock removed [3,714 cubic yards total minus 3,300 cubic yards paid for, leaving a balance of 414 cubic yards.] At $55 per cubic yard under the unit price of the contract the total sum allegedly due is $22,770.00. This sum constituted a part of the damages awarded to the plaintiff by the trial judge.
Our inquiry now focuses on how the figure of 800 cubic yards of rock became a clause in the contract. As pointed out in the State's brief, and as contained in Plaintiff's Exhibit No. 10, a rock clause is a part of State policy in regard to building construction:

Rock clauses shall be included in every contract where rock is anticipated. Wherever reasonable, an estimated quantity of rock shall be included in the base bid, with a unit price to be quoted for adjustments above and below the stated quantity.
Property Control and Construction Manual, Planning Procedures Related to Design and Construction of Capital Improvement Projects of the State of North Carolina, Chap. XXXV, Sec. VI(d) (4th Ed. 1972).
It was in response to this requirement that the architect inserted section 0230 (quoted earlier in this opinion) as a part of the Supplementary General Conditions of the Contract. The specific figure of 800 cubic yards was an estimate by the architect based upon the 26 April 1974 written report of test borings prepared by Soil & Material Engineers, Inc. from a subsurface investigation of the project site. This report was a public document and available for inspection by any contractor prior to bid submission.
The trial judge found as a fact that:
[T]he information depicted on Contract drawing S-13 contains an inaccurate representation of the top of the rock to be encountered on the Project. As is confirmed by minutes (Plaintiff's Ex. 53) of a private meeting between the Project Architect and representatives of the Owner which occurred on March 2, 1976, an error had been made in calculating the 800 cubic yard estimated quantity set forth in Specification Section 0230. In addition to the computational error, the Project Architect had also discovered that the top of rock information depicted in the Subsurface Report and on Sheet S-13 was incorrect by approximately two and one-half feet in that the top of rock actually encountered by Davidson & Jones on the Project was some two and one-half feet (on the average) above the top of rock depicted in the Subsurface Report and on Contract drawing S-13.
Although there was some rock outcropping on the site, the court found that when plaintiff and its subcontractor investigated the job site that "there existed no reasonable observable physical facts within the Project limits which would have indicated to them that the State's estimate of approximately 800 cubic yards of rock was substantially in error or that any condition existed which required further site investigation."
*722 The trial court concluded as a matter of law: (1) "that both Davidson & Jones and the State were unaware of the actual quantity of rock which would have to be excavated... and were thus mutually mistaken as to a material fact"; (2) "[t]hat there has been a breach of the implied warranty of the adequacy and accuracy of the plans and specifications"; and (3) that the more than 400% overrun in estimated rock quantity "constitutes a material change in the scope of the Project work for which additional compensation is due Davidson & Jones under the Contract."
As for the "unanticipated duration related expenses," the court concluded at least 26 weeks were involved, that the plaintiff kept business records of the costs incurred, and that the plaintiff was entitled to additional compensation in the amount of $110,710.00 for "General Conditions costs (the cost of Davidson & Jones, job site establishment, supervision, utilities, equipment, and similar time-related expenses)." The total award of damages were concluded by the trial court to be "a direct and proximate result of Davidson & Jones encountering the unanticipated variation of a material bid item" for which the plaintiff was "entitled to recover from the State as an equitable adjustment under the Contract." The source of the equitable adjustment was also said to be "pursuant to the Contract, Articles 15 and 16."
We now turn to the assignments of error brought forward in the brief by the State in its questions presented. We choose to discuss question number 3 concerning the denial of the State's motion for a dismissal or directed verdict at the close of the plaintiff's evidence, as the key to our decision. While the State also assigns as error the denial of its motion for partial summary judgment no separate treatment of this is required by virtue of the subsequent motion for a directed verdict. Within the discussion on directed verdict we will also treat the related question number 5 as to whether, in law, the plaintiff was entitled to an equitable adjustment in compensation. The State's remaining questions relate solely to the admission or exclusion of evidence. We also note that the thrust of the plaintiff's cross-appeal raises the issue of whether the court erred in denying plaintiff's request for additional compensation for home office overhead.
To bring these issues into focus, we pose the question also suggested in plaintiff's brief under its discussion of the motion for directed verdict: Does the Contract authorize a recovery such as Davidson & Jones was awarded by the trial court? And, does the Contract authorize additional compensation for home office overhead?
Since this was a nonjury case our scope of review is controlled by G.S. 1A-1, Rule 41(b) instead of Rule 50(a) [the defendants referred to both Rules in their motion to the trial court.] Rule 41(b) has been fully analyzed by our Supreme Court in Lumbee River Electric Corp. v. City of Fayetteville, 309 N.C. 726, 741, 309 S.E.2d 209, 218 (1983). This motion to dismiss "challenges the sufficiency of plaintiff's evidence [and law, per Rule 41(b) ] to establish plaintiff's right to relief." Id.
It is the State's position that while a contractor may bring an action against the State for contract damages, the action must be based upon a specific contractual provision which the State has allegedly violated. Because the contract contains no provision for an "equitable adjustment" or for the recovery of any type of delay damages, the State contends the plaintiff cannot recover any additional money.
The North Carolina General Assembly has determined the circumstances under which the State may be sued for breach of contract by its enactment of G.S. 143-135.3. It is captioned "Procedure for settling controversies arising from contracts; civil actions on disallowed claims." Among its provisions we find these words:
Upon completion of any contract for construction... work ... should the contractor fail to receive such settlement as he claims to be entitled to under terms of his contract, he may ... submit ... a written and verified claim for such amount as he deems himself entitled to *723 under the terms of said contract, setting forth the facts upon which said claim is based....
As to such portion of a claim which may be denied ... the contractor may... institute a civil action for such sum as he claims to be entitled to under said contract by the filing of a verified complaint and issuance of summons .... [Emphasis added.]
When our Supreme Court resolved the case of Middlesex Construction Corp. v. State ex rel. Art Museum Bldg. Comm., 307 N.C. 569, 574, 299 S.E.2d 640, 643 (1983), rehearing denied, 310 N.C. 150, 312 S.E.2d 648 (1984), it discussed the case of Smith v. State, 289 N.C. 303, 222 S.E.2d 412 (1976), reversed on other grounds, 298 N.C. 115, 257 S.E.2d 399 (1979), and said: "We read nothing in Smith which would indicate an intention to modify, ameliorate or abrogate the legislative mandate of G.S. 143-135.3." Accordingly, we hold that the State's waiver of sovereign immunity in a breach of contract action is valid only to the extent expressly stated in the statute, and that the plaintiff's remedy here must be found exclusively within the express terms of the statute. The statute is clear in limitation of recovery except as otherwise provided "under terms of his contract." [Emphasis added.] We hold that "under terms of his contract" neither general conditions costs nor home office overhead costs can be recovered under the contract. Specifically under Article 16, if the plaintiff had felt that it was being required to perform extra work by the engineer or architect outside of the contract, the plaintiff had a duty to "give written notice therefor to the Engineer or Architect without delay, and... not proceed with the work affected until further advised." Even then Article 16 requires a written change order supporting the change. Only after all rock excavation had been substantially completed did the plaintiff seek to apply Articles 15 and 16 of the contract so as to acquire financial relief.
One pertinent change order, known as G-4, requires specific examination. It resulted in a payment by the State to plaintiff of $111,985.00, and was a mutually agreed upon amendment to the contract. Change Order G-2 had preceded G-4 on 27 February, 1976 which granted plaintiff a partial payment of $50,000.00. G-4 came as a result of plaintiff's request on 19 March 1976 for compensation for "final rock excavation quantities" of 3,663.5 cubic yards, and for quantities not previously paid at $55.00 per cubic yard. This March request did not contain any demand or claim for additional compensation for "general condition" costs, "time delay" costs, or "home office overhead" costs. The controlling words of the final paragraph of G-4 provide that the State will pay the net amount for any and all rock excavation to date plus payment for adjustments caused in all other construction. It further relates the sum of $111,985.00 as this net amount. The plain language of G-4 does not show a contract requiring the State to pay overhead, general conditions costs, or time delay costs, or profit, in contravention of the "terms of his contract."
As noted earlier, actual excavation of rock began on 28 July 1975. As of 8 October 1975 the architect's records indicate the subcontractor had excavated 1,100 cubic yards of rock. As of 12 November 1975 a total of 1,508 cubic yards had been excavated. On 30 January 1976 plaintiff informed the architect that the subcontractor had removed 2,930 cubic yards of rock. Thus, early in the excavation the plaintiff had actual knowledge of a massive overrun of rock. The record fails to show that at any time up to 10 October 1975, (the date the plaintiff had set as his critical date to complete the rock excavation), or at any time during the year 1975, did the plaintiff contend under the terms of his contract that he was entitled to money damages different from the unit price of $55.00 per cubic yard. The plaintiff is bound by its contract.
As another ground for relief the plaintiff vigorously argues mutual mistake and material misrepresentation in the quantity of rock to be excavated. It is a fact *724 beyond question that 3,714 cubic yards is materially and substantially different from 800 cubic yards of rock. The encounter of the greater quantity of rock did cause time delay in the completion of construction and did result in additional general costs and in some additional amount of home office costs. But the contract is plain, stating in Article 15(a) that: "[N]o allowance shall be made for overhead and profit." Also, the contract states that "[u]nit prices are net and no profit or overhead shall be added or deducted when applying unit prices." It was anticipated by both parties that some rock would be encountered and both hedged against the assumed risk in the unit price of $55.00, which also gave the plaintiff a $5.00 per cubic yard margin over its subcontract.
To understand the figure 800 cubic yards of rock removal with regard to construction and building contractors' work and to comprehend that this figure is not a "mutual mistake," "misrepresentation," or a "breach of implied warranty," we consider and examine the term "mistake" in relation to an aleatory promise or one that is "of or depending on chance, luck, or contingency." Webster's New World Dictionary (2d College Ed.1980). Black's Law Dictionary (Rev. 4th Ed. 1951) defines an aleatory contract as "[a] mutual agreement, of which the effects, with respect both to the advantages and losses, whether to all of the parties or to some of them, depend on an uncertain event." With these definitions in mind Corbin, a recognized authority on Contracts, says:
When a contractual promise is aleatory in character, the performance being made expressly conditioned upon an uncertain and hazardous event, the promisee bets that it will happen and the promisor bets that it will not. The consideration exchanged for such a promise varies in proportion to their opinion as to probability. They consciously assume the risk. If the event occurs, or occurs sooner than the promisor expects, he is the loser; if it fails to occur or occurs later than the promisee expects, it is he who is the loser. The opinion of one of them as to probability is thus shown to have been erroneous; but his mistake is not ground for rescission because he consciously assumed the risk. 3 Corbin on Contracts Sec. 598 (1960).
Both plaintiff and the defendants were aware of the existence of some rock and were aware that there could be an overrun or underrun from 800 cubic yards. They consciously considered this factor when fixing the unit price at $55.00 per cubic yard. As Corbin indicates further in such a situation:
There is no mistake; instead, there is awareness of the uncertainty, a conscious ignorance of the future.... They were aware of the uncertainty, estimated their chances, and fixed the compensation according. Id. at p. 586.
A "mistake" according to Restatement, Contracts Sec. 500, [cited in 3 Corbin on Contracts at p. 579, fn. 1] "means a state of mind that is not in accord with the facts." Neither party knew of the error in the quantity of rock at the time the contract was entered into. The risk of such error having been assumed by both parties by the conscious inclusion of a unit price for overruns cannot be shifted by a resort to custom or oral change because the parties agreed to the allocation of this risk in writing. As Corbin puts it, "[t]he risk of unexpected cost and difficulty in the performance of construction contracts is usually carried by the building contractor." Corbin, supra, at p. 590. In the final analysis Corbin concludes that "[w]e can only say that the parties can control the matter by agreement; but interpretation may be difficult." Id. at p. 591. Contracts are "`devices to allocate the risks of life's uncertainties,'" and "`[w]here parties allocate the risk of loss ... the commentators and the opinions are agreed there is little room for judicial relief from resulting losses.'" Id. at p. 703 (Supp.1984), quoting Aluminum Co. of America v. Essex Group, Inc., 499 F.Supp. 53 (W.D.Pa.1980).
We now examine a related facet of the "judgment." In Conclusion of Law No. *725 35(c) the trial court reasoned that the plaintiff was entitled to recover "$2,369.00 for late payments by the State during construction for rock removal." This conclusion is based upon Finding of Fact No. 56 which says: "Davidson & Jones' records also indicated that late payment by the Owner for rock excavation resulting in Davidson & Jones incurring $2,369.00 in financing costs." While the State did except to all of Conclusion of Law No. 35, and assign as error that the same was not supported by sufficient evidence nor proper findings of fact, we note that the State failed to except to Finding of Fact No. 56. Our court has held in In re Smith, 56 N.C.App. 142, 149, 287 S.E.2d 440, 444, cert. denied, 306 N.C. 385, 294 S.E.2d 212 (1982), that "[b]y failing to except to the findings of fact, they are deemed to be supported by competent evidence and are conclusive on appeal." However, the remainder of the interpretation of the rules, as stated by our court in Wynnewood Corp. v. Soderquist, 27 N.C.App. 611, 615, 219 S.E.2d 787, 790 (1975), holds that "the conclusions of law made by the judge upon the facts found are reviewable on appeal."
We interpret Finding of Fact No. 56 to mean that plaintiff incurred $2,369.00 in financing costs during the period of construction. We hold that because the contract by its terms does not provide for "financing costs" that the plaintiff cannot recover any financing costs. We reverse the award of $2,369.00 to the plaintiff.
We next examine the subject of the recovery of interest against the State. By its Conclusion of Law No. 37 the trial court ruled:
That Davidson & Jones is entitled to recover interest on the amounts set forth in the above Conclusions of Law at the rate of five percent (5%) per annum from March 31, 1976.
This was error, and the award of any interest is reversed.
"A long-standing rule in this State" as we held in Stanley v. Retirement and Health Benefits Division, 66 N.C.App. 122, 123, 310 S.E.2d 637, 638 (1984), establishes that "the State is not required to pay interest on its obligations unless authorized by contract or statute," citing in support the cases of Cannon v. Maxwell, Comr. of Revenue, 205 N.C. 420, 171 S.E. 624 (1933), and Teer Co. v. Highway Comm., 4 N.C. App. 126, 166 S.E.2d 705 (1969). In Stanley, the plaintiff recovered the principal amount of death benefits, but no interest was allowed against the State. In Cannon, no interest was allowed on taxes refunded after being paid under protest. It was Chief Justice Ruffin of our Supreme Court who made plain the law of interest in North Carolina in 1843 when he wrote that "the State never pays interest unless she expressly engages to do so." Attorney General v. Navigation Co., 37 N.C. 444, 454 (1843). Also see, United States v. North Carolina, 136 U.S. 211, 10 S.Ct. 920, 34 L.Ed. 336 (1890).
Our attention has not been called to any statute authorizing the recovery of any interest against the State on breach of contract on the facts of this case, and we are unaware of any. G.S. 143-134.1, entitled "Interest on final payments due to prime contractors," has been examined by this Court, but found not to be applicable on the face of its textual language.
The only remaining source of authority for the payment of interest would be the contract itself. We are at a loss to know the source of the trial court's figure of 5% for the purported award of interest. We have examined the record on appeal and exhibits, but find no mention of "5%" interest within the contract. We would also point out the following stipulation in the record on appeal.
No documents or pleadings which are not set forth in this record are necessary for understanding the exceptions relied on....
We assume the date "March 31, 1976," the alleged date from which interest was to begin, was considered by the trial court to be the date of breach. However, under the law of North Carolina there can be no prejudgment recovery of interest against the State in the absence of statute or contract *726 provision. Likewise, there can be no postjudgment recovery of interest against the State. The legal rate of interest as established by G.S. 24-1 is not applicable here. Neither does G.S. 24-5 apply, which speaks to the recovery of interest from judgment on contract cases, because here the State is the party against whom judgment has been recovered. While interest was approved under G.S. 24-5 when the State was a party in Edmisten, Attorney General v. Chemical Co., 45 N.C.App. 604, 263 S.E.2d 849 (1980), we would point out that it was the defendant Zim Chemical Company, Inc., who was ordered to pay interest from judgment, and not the State. We also point out that as recent as Myers v. Department of Crime Control and Public Safety, N.C.App., 313 S.E.2d 276 (1984), another panel of this Court concluded that postjudgment interest could not be awarded or collected against the State under the State Torts Claims Act because of the lack of any statutory enactment upon which to assess interest.
We now turn to that document in the record which all parties have treated as a "final judgment," but which lacks an essential formal ingredient to be a judgment. At no point in the document called "Findings of Fact and Conclusions of Law," filed 19 July 1982, from which appeals were taken, did the judge make a decree or judgment. In other words the document lacks the customary final portion of a judgment that usually begins: Now, therefore, it is ordered, adjudged and decreed that, etc. [We note that under today's rules of procedure any one of the three synonymns would be sufficient.]
As it stands, the defendants have not been "ordered" to do anything. The document also fails to tax the costs below. The court in its Conclusion of Law No. 36, however, did state that it denied relief to the plaintiff for additional compensation for home office overhead. Similarly, it could be argued that Conclusion of Law No. 35 constituted a formal award of money damages to the plaintiff. See Annot., 73 A.L.R.2d 250, 291 (1960).
The results are:
A. As to the State's appeal:
We affirm the trial court's award to the plaintiff of $22,770.00 for the 414 additional cubic yards of rock removed as being according to the terms of the contract.
We reverse the award of $2,369.00 for financing costs as not being within the terms of the contract.
We reverse the award of $110,710.00 as General Conditions costs as not being within the terms of the contract.
B. As to the Plaintiff's appeal:
We affirm the trial court's denial of any compensation to the plaintiff for home office overhead as not being within the terms of the contract.
C. We remand for entry of a proper judgment in accordance with this opinion.
Affirmed in part; reversed in part; and remanded for judgment.
VAUGHN, C.J., and EAGLES, J., concur.