MICHAEL A. KELLY, STEVEN WAYNE MOBLEY, Petitioners v. N.C. DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, Respondent

No. COA07-881

(Filed 19 August 2008)

**1. Public Officers and Employees— discipline of state employees—suspension for misconduct—fishing violations**

In an action that began with NCDENR officials receiving citations for fishing violations and then being suspended for five days without pay, the trial court did not err by finding that the violations were not intentional, that the impact of the publicity on NCDENR was neutral and not negative, that there was no lasting negative effect from the conduct giving rise to the fishing tickets, and that there was no adverse impact on impairment of petitioners' ability to do their jobs.

**2. Public Officers and Employees— fishing tickets—not conduct unbecoming**

The trial court did not err by concluding that petitioners had not engaged in unacceptable personal conduct unbecoming a

───────

state employee where they had received fishing citations. The trial court made findings relating to each of the relevant factors and properly concluded that a rational nexus did not exist between the off-duty criminal activity giving rise to the fishing tickets and the potential adverse impact on petitioners' future ability to perform for the agency.

**3. Public Officials and Employees— wrongful suspension— interest on back pay award .**

The trial court erred by awarding prejudgment and postjudgment interest on back pay awards for state employees wrongfully suspended. The State Personnel Commission rules specifically provide that the State shall not be required to pay interest on any back pay award.

**4. Costs— attorney fees—insufficient findings**

The trial court erred by awarding partial attorney fees to improperly disciplined state employees without making necessary findings as to the reasonableness of the fees awarded. N.C.G.S. §§ 6-19.1, 6-20.

Appeal by respondent from orders entered 19 April 2007 by Judge Ronald Stephens in Wake County Superior Court, and appeal by petitioners and respondent from order entered 4 June 2007 by Judge Ronald Stephens in Wake County Superior Court. Heard in the Court of Appeals 28 April 2008.

*Shanahan Law Group, by Kieran J. Shanahan, Reef C. Ivey, II, and Steven K. McCallister, for petitioners-appellees.*

*Roy Cooper, Attorney General, by Tiare B. Smiley, Special Deputy Attorney General, and Edwin Lee Gavin II, Assistant Attorney General, for respondent-appellant.*

MARTIN, Chief Judge.

Respondent North Carolina Department of Environment and Natural Resources ("NCDENR") appeals from orders of the Wake County Superior Court concluding that petitioners Michael Kelly and Steven Wayne Mobley had received employment discipline without just cause and awarding them back pay, interest on back pay, and partial attorney fees and costs. Petitioners also appeal from the order awarding attorney fees and costs.

KELLY v. N.C. DEP'T OF ENV'T & NATURAL RES.

[192 N.C. App. 129 (2008)]

During the period of time relevant to the facts of this case, petitioners were employees of NCDENR in the Division of Environmental Health ("DEH"). Michael Kelly was Deputy Director of DEH, while Steven Wayne Mobley was Chief of the Shellfish Sanitation Section of DEH. Petitioners had been employed by the State of North Carolina for fourteen and thirty-one years, respectively. On the evening of 14 June and the early hours of 15 June 2004, petitioners were fishing in the White Oak River. Over the course of the evening, petitioners gigged seventeen flounder and two red drum. While they were preparing to head inland at approximately 12:30 a.m., a Division of Marine Fisheries ("DMF") patrol boat stopped petitioners' boat. After talking with petitioners about their catch that night, DMF officers asked to inspect their fishing coolers, and petitioners consented to the inspection. DMF officers asked petitioners if they knew the minimum flounder size limit, and petitioners replied that they thought it was either thirteen or thirteen and one-half inches. In fact, the applicable flounder size regulation had recently changed from thirteen inches to fourteen inches. DMF officers informed petitioners that the size limit for the recreational taking of flounder was fourteen inches.

Upon inspecting petitioners' fishing coolers, DMF officers determined that twelve of the seventeen flounder were less than fourteen inches, and the two red drum had been gigged, which is not a permitted technique for taking red drum. The violations of applicable fishing laws were each a class one misdemeanor. DMF officers issued each petitioner a citation for taking six undersized flounder and possessing one gigged red drum. Petitioners were cooperative with DMF officers, and the following day they immediately notified their supervisors about the citations. The incident was reported in several local newspapers and a local sporting publication. NCDENR conducted an investigation of the incident to determine whether any disciplinary action was warranted. The investigation resulted in allegations against petitioners of unacceptable personal conduct unbecoming a state employee that is detrimental to state service. Because petitioners were salaried employees exempt from the overtime compensation provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., the departmental human resources office stated that the choices for disciplinary action were either a written warning, suspension without pay for five days, or suspension without pay for ten days, pursuant to 25 N.C. Admin. Code 1J.0611. After holding a predisciplinary conference, Director of the Division of Environmental Health Terry Pierce on 29 July 2004 imposed disciplinary suspensions for five days with-

out pay for unacceptable personal conduct. Petitioners appealed to Secretary of NCDENR William Ross, who affirmed Director Pierce's disciplinary action. Petitioners filed petitions for contested case hearings with the Office of Administrative Hearings. On 28 December 2004, an administrative law judge ("ALJ") entered a written decision reversing their suspensions and finding that NCDENR lacked just cause to discipline petitioners and that their suspensions were arbitrary and capricious. The ALJ also found that petitioners were entitled to back wages and attorney fees and costs. The State Personnel Commission ("SPC") subsequently rejected the ALJ's decision and adopted new findings of fact and conclusions of law affirming NCDENR's decision to discipline petitioners. Petitioners sought judicial review of the SPC's decision in Wake County Superior Court, and the court found that petitioners did not intentionally violate the fishing laws, but rather their actions amounted to a careless mistake; that no lasting effects arose from petitioners' conduct; that a recurrence of petitioners' conduct was unlikely; and that petitioners' conduct had not impaired their ability to perform their job duties and would not adversely impact their future ability to perform for NCDENR. Accordingly, the court concluded that petitioners did not engage in unacceptable personal conduct that is detrimental to state service and that NCDENR did not have just cause to suspend petitioners from work for five days without pay. As a separate and independent basis for its decision, the court further concluded "that 25 N.C.A.C. 01J.0611 is void as applied on the particular facts in this case because it did not permit the exercise of discretion in determining appropriate disciplinary action." In a separate order filed 4 June 2007, the superior court awarded partial attorney fees and costs to petitioners. NCDENR appeals both of the superior court orders, and petitioners appeal the 4 June 2007 order to this Court.

---

In cases of judicial review of agency decisions, "[t]he scope of review to be applied by the appellate court under this section is the same as it is for other civil cases. In cases reviewed under G.S. 150B-51(c), the court's findings of fact shall be upheld if supported by substantial evidence." N.C. Gen. Stat. § 150B-52 (2007). N.C.G.S. § 150B-51(c) governs review by a superior court of "a final decision in a contested case in which an administrative law judge made a decision, in accordance with G.S. 150B-34(a), and the agency does not adopt the administrative law judge's decision." N.C. Gen. Stat. § 150B-51(c) (2007). Due to the procedural background in this case, the superior court reviewed the SPC's decision under § 150B-51(c).

Accordingly, we consider whether the findings of fact are supported by substantial evidence, defined as "relevant evidence a reasonable mind might accept as adequate to support a conclusion." N.C. Gen. Stat. § 150B-2(8b) (2007). Furthermore, where a party does not except to a finding of fact, it is "presumed to be correct and supported by evidence." *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982).

In examining the appellate standard of review in similar cases, this Court and our Supreme Court have noted that our review further entails "determining how the trial court *should have* decided the case upon application of the appropriate standards of review." *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 665, 599 S.E.2d 888, 898 (2004). In the case before us, the trial court's standard of review is determined by N.C.G.S. § 150B-51(c), which states:

> In reviewing a final decision in a contested case in which an administrative law judge made a decision, in accordance with G.S. 150B-34(a), and the agency does not adopt the administrative law judge's decision, the court shall review the official record, de novo, and shall make findings of fact and conclusions of law. In reviewing the case, the court shall not give deference to any prior decision made in the case and shall not be bound by the findings of fact or the conclusions of law contained in the agency's final decision.

N.C. Gen. Stat. § 150B-51(c) (effective January 1, 2001).[1] Accordingly, the trial court examined both the findings of fact and the conclusions of law under a *de novo* standard of review and, therefore, we need not consider whether the trial court's review conformed to a more restrictive standard.

[1] We first consider NCDENR's argument that the trial court erred in making five findings of fact that were not supported by substantial evidence.

The trial court found:

> Petitioners acknowledged that they were mistaken in their understanding of the applicable fishing laws and that they should have known the rules. Petitioners were careless in their violation of the fishing laws; their violations were not intentional. Pe-

---

1. N.C.G.S. § 150B-51 was amended in 2000 to add subsection (c). 2000 N.C. Sess. Laws ch. 190, § 11. The amendment applies to contested cases commenced on or after 1 January 2001.

titioners were apologetic, both privately within NCDNER [sic] and in public; they promptly acknowledged responsibility for their actions and promptly paid their $50.00 fines plus $100.00 in court costs.

NCDENR argues that the facts do not reflect carelessness but rather demonstrate a deliberate disregard for the rules. To the contrary, substantial evidence supported the court's finding that petitioners were mistaken and that their violations were not intentional or deliberate. The DMF officers who issued the citations wrote in a narrative of the event that Mr. Mobley "had made a mistake." In addition, petitioners described the incident as arising from the fact that they "both thought the minimum was 13 1/2 inches," Mr. Kelly was "totally unaware that it was illegal to gig a Drum," and "the second Drum was mistakenly taken." Mr. Kelly specifically wrote in his statement to Secretary Ross "[t]here was never any malicious attempt to break the law or intentionally take fish illegally." Secretary Ross testified that "they had made a mistake, yes. The mistake was not knowing the rules." Therefore, we affirm this finding of fact.

The trial court next found:

Only a few articles and commentaries were written about the incident in newspapers and a sporting publication. In general those articles demonstrated both the fact that two NCDNER [sic] employees violated fishing regulations, and the fact that NCDNER [sic] actually enforces those fishing regulations— even against its own employees. The impact of those articles and commentaries in the public, on balance, is neutral but certainly not negative. The articles show that the law is being enforced evenhandedly against anyone who violates the law, even unintentionally.

NCDENR argues that because news publications criticized petitioners, the overall impact of the publicity must be negative. NCDENR's argument fails to appreciate the aspect of the publicity which reported that petitioners were punished for their conduct, as any member of the general public would be, notwithstanding their position with the agency. Substantial evidence supported this neutralizing aspect of the publicity, where Secretary Ross testified:

Q. In all of these articles, letters, editorials, whatever you wish to call them in the entire bunch, is it not fair to say that the Department is being lauded for busting its own officials?

A. Yes, to the extent the articles talk about that. It was uniformly reported, it seemed to me, that the Marine Patrol officers did what they should have done, did a good job.

Therefore, we also affirm this finding of fact.

The trial court also found "[no] lasting negative effects have arisen from the conduct giving rise to the fishing tickets." NCDENR argues that "potential lasting negative effects are self-evident," citing a negative impact on the public's voluntary compliance with fishing regulations as well as the public's perception that the agency was not abiding by the same rules it enforces against the general public. With regard to the effect on voluntary compliance, Director Pate testified:

Q. [S]ince [the incident], have you had wholesale increase of violations of gigged drums or flounders too small?

A. I'm not aware of any major changes in the incidents [sic] of those types of violations.

Secretary Ross testified that he did not know whether people were actually violating fishing regulations as a result of the publicity.

With regard to the effect the publicity had on public opinion about NCDENR, Director Pate was asked whether his concern about the way that petitioners' actions would be interpreted by the general public came to fruition. Director Pate testified "it has not been quantified. Reactions of that nature by the public and by my staff are very difficult to measure." Further, Director Pierce testified:

Q. [In] the eleven months since your deposition[, h]ave you seen anywhere on e-mail, on—in the newspapers on fishing—have you anywhere seen a discussion of this fishing incident again?

A. I have not looked for nor have I found.

When asked how he had followed up to assess the impact of petitioners' actions on the public, Director Pierce testified that he worked with two public information officers who scan newspapers in the state and the adjoining states for agency publicity, and neither officer had called any articles to his attention. By testifying that they were not aware of any increases in fishing violations or any instances of continued or lasting publicity of the incident, the witnesses' testimony was substantial evidence that no lasting negative effects had occurred.

The trial court subsequently found "[g]iven the circumstances surrounding this case, a recurrence of [p]etitioners' conduct giving rise to the fishing tickets is unlikely." NCDENR argues that, without employment discipline, petitioners would have no reason not to repeat their conduct. Evidence was presented to show that, in addition to employment discipline, petitioners were subject to embarrassment, both personally, at work, and publicly, and punishment under the law, including a monetary penalty of $150 each. Furthermore, petitioners' repeated apologies expressed their regret and indicated that they learned from their mistake. Therefore, we affirm this finding of fact.

Ultimately, the trial court found:

> At no point were [p]etitioners, as a consequence of the conduct giving rise to their fishing tickets, impaired to any extent in performing their job duties with NCDNER's [sic] Division of Environmental Health, or in interacting with their respective staffs, or in interacting with other Divisions within NCDNER [sic], nor was there ever a potential threat of any adverse impact on their future ability to perform for the agency. There was no adverse impact on [p]etitioners' colleagues or on the quality of [p]etitioners' work.

NCDENR argues that the "evidence showed that working relationships and interagency harmony were harmed," as was petitioners' relationship with the public. As previously noted, the evidence showed that NCDENR and petitioners' relationship with the public suffered no quantifiable or evident harm.

With regard to their ability to perform their job duties and interact with their own staff and the staff in other divisions of NCDENR, Director Pierce, Director Pate, and Secretary Ross all testified that no harm had resulted. Director Pierce, petitioners' supervisor in DEH, testified that he had not talked to any of the staff in the Shellfish Sanitation Section of his division about their feelings toward petitioners, but that he had received a letter of support from an employee in the Shellfish Sanitation Section. Director Pierce also indicated that both petitioners received a rating of "outstanding" on their performance evaluations after the fishing incident, which included an evaluation of "leadership qualities," "staff guidance," "how his subordinates viewed him," and "working relationship . . . with everybody else in the . . . Division and the Department."

KELLY v. N.C. DEP'T OF ENV'T & NATURAL RES.

[192 N.C. App. 129 (2008)]

Director Pate, head of DMF, testified:

Q. When you indicate you were concerned that you-all shared and have separate regulatory actions, was your concern that your people could not do their job based on Mr. Mobley's fishing citation?

A. No, it was not.

Q. Was your concern [that] Mr. Mobley could not do his job based on the fishing citation?

A. No.

Q. Was your concern that your officers would somehow feel that they couldn't do their job?

A. No.

. . . .

Q. Has [the incident] affected your working relationship [with Mr. Mobley]?

A. No, sir.

. . . .

Q. . . . So despite your concern, it has not manifested itself in any way?

A. That's correct.

Q. And do you know if it's manifested itself with any of your enforcement officers or any of your staff that deals with Mr. Mobley?

A. Not aware of it, and I would be disappointed if it did.

. . . .

Q. [I]s it fair to say that your relationship with Mr. Kelly hasn't been affected at all?

A. No, sir, it has not been changed.

Q. And at that point when this happened, did you have any concern that it would be affected with Mr. Kelly?

A. The concern was there, yes, but again, it has not manifested itself.

Secretary Ross testified:

Q. . . . But the simple fact is, you never got any information after the phone call on June 21st expressing disappointment and concern—you never got any information from the Marine Patrol offices, officers, people that the relationship was not working, that this thing had caused problems?

A. No. That's true.

. . . .

Q. Do you have any objective evidence after the hearing that there has been—or even before the hearing—that there has been any intradepartmental harm?

A. No.

Although there was concern about potential harm to the agency, it is apparent from the testimony that those concerns were unfounded. We find substantial evidence was presented to support the trial court's finding of fact that there was no adverse impact on or impairment of petitioners' ability to do their jobs.

[2] By separate argument, NCDENR contends that the trial court erred in concluding that petitioners did not engage in unacceptable personal conduct "unbecoming a state employee that was detrimental to state service" and that NCDENR lacked just cause to discipline petitioners. Disciplinary actions for state employees are governed by N.C.G.S. § 126-35, which states: "No career State employee subject to the State Personnel Act shall be discharged, suspended, or demoted for disciplinary reasons, *except for just cause*." N.C. Gen. Stat. § 126-35(a) (2007) (emphasis added). "Disciplinary actions, for the purpose of this Article, are those actions taken in accordance with the disciplinary procedures adopted by the State Personnel Commission and specifically based on unsatisfactory job performance, unacceptable personal conduct or a combination of the two." N.C. Gen. Stat. § 126-35(b). In this case, NCDENR cited unacceptable personal conduct as the basis for discipline. Unacceptable personal conduct includes, in its definition, "conduct unbecoming a state employee that is detrimental to state service." 25 N.C. Admin. Code 1J.0614(i)(5) (2008).

Because the underlying conduct is undisputed, the only inquiry before this Court is whether just cause existed for petitioners' disci-

pline. *See Carroll*, 358 N.C. at 665, 599 S.E.2d at 898. We note our Supreme Court's language from *Carroll*:

> [T]he fundamental question in a case brought under N.C.G.S. § 126-35 is whether the disciplinary action taken was "just." . . .
>
> "Just cause," like justice itself, is not susceptible of precise definition. It is a flexible concept, embodying notions of equity and fairness, that can only be determined upon an examination of the facts and circumstances of each individual case. Thus, not *every* violation of law gives rise to "just cause" for employee discipline.

*Id.* at 669, 599 S.E.2d at 900-01 (citations and internal quotation marks omitted). As part of the just cause analysis, this Court has held:

> [W]here an employee has engaged in off-duty criminal conduct, the agency need not show actual harm to its interests to demonstrate just cause for an employee's dismissal. However, it is well established that administrative agencies may not engage in arbitrary and capricious conduct. Accordingly, we hold that in cases in which an employee has been dismissed based upon an act of off-duty criminal conduct, the agency must demonstrate that the dismissal is supported by the existence of a *rational nexus* between the type of criminal conduct committed and the potential adverse impact on the employee's future ability to perform for the agency.

*Eury v. N.C. Emp. Sec. Comm'n*, 115 N.C. App. 590, 611, 446 S.E.2d 383, 395-96 (citations omitted), *disc. review denied*, 338 N.C. 309, 451 S.E.2d 635 (1994). Although this Court in *Eury* discussed the issue of just cause specifically in the context of "dismissal," we note that the logic requiring a rational nexus applies equally in any case of state employee discipline. *See id.* at 610, 446 S.E.2d at 395 (referencing N.C.G.S. § 126-35(a) in its entirety in a discussion of the connection between conduct and negative consequences, where § 126-35(a) governs discharge, suspension, *and* demotion).

> In determining whether a rational nexus exists, the Commission may consider the following factors:
>
> —the degree to which, if any, the conduct may have adversely affected clients or colleagues;

—the relationship between the type of work performed by the employee for the agency and the type of criminal conduct committed;

—the likelihood of recurrence of the questioned conduct and the degree to which the conduct may affect work performance, work quality, and the agency's good will and interests;

—the proximity or remoteness in time of the conduct to the commencement of the disciplinary proceedings;

—the extenuating or aggravating circumstances, if any, surrounding the conduct;

—the blameworthiness or praiseworthiness of the motives resulting in the conduct; and

—the presence or absence of any relevant factors in mitigation.

*Id.* at 611, 446 S.E.2d at 396. This Court further noted that this list is not all-inclusive; however, it is instructive in any analysis of the existence of a rational nexus. *Id.*

The trial court made findings of fact relating to each of the relevant factors, as follows. With respect to any adverse effect on clients or colleagues, the trial court found "[t]here was no adverse impact on [p]etitioners' colleagues." As for the relationship between the criminal conduct and the type of work performed by the employee and the agency, the trial court concluded "[p]etitioners' job duties did not include enforcing regulations for fin fish, and there is, therefore, not a close relationship between the conduct at issue and the type of work performed by [p]etitioners." To the extent this conclusion of law is actually a finding of fact, we treat it as such. *See Gainey v. N.C. Dep't of Just.*, 121 N.C. App. 253, 257 n.1, 465 S.E.2d 36, 40 n.1 (1996) ("Although denominated as a conclusion of law, we treat this conclusion as a finding of fact because its determination does not involve the application of legal principles."). NCDENR does not challenge the fact that petitioners did not enforce fin fish regulations, and that fact supports the trial court's conclusion that a close relationship did not exist. With regard to the likelihood of recurrence of the questioned conduct, the trial court found "a recurrence of [p]etitioners' conduct giving rise to the fishing tickets is unlikely." As for the degree to which the conduct may affect work performance, and work quality, the trial court found:

At no point were [p]etitioners, as a consequence of the conduct giving rise to their fishing tickets, impaired to any extent in performing their job duties . . . , or in interacting with their respective staffs, or in interacting with other Divisions within NCDNER [sic], nor was there ever a potential threat of any adverse impact on their future ability to perform for the agency. There was no adverse impact on [p]etitioners' colleagues or on the quality of [p]etitioners' work.

With respect to the effect on the agency's good will, the trial court found that the publicity was neutral and had no lasting effects. The trial court also found some mitigating factors, including "[p]etitioners were very cooperative and polite to the DMF Officers, and later were complimentary of the DMF Officers for issuing the citations," and "[p]etitioners were apologetic, both privately within NCDNER [sic] and in public; they promptly acknowledged responsibility for their actions and promptly paid their $50.00 fines plus $100.00 in court costs."

In light of these factors, the trial court properly concluded that "[a] 'rational nexus' does not exist in this matter between the off-duty criminal conduct at issue—conduct giving rise to the fishing tickets—and the potential adverse impact on [p]etitioners' future ability to perform for [NCDENR]." Where the agency fails to show a rational nexus, there cannot be just cause for discipline. *Eury*, 115 N.C. App. at 611, 446 S.E.2d at 395-96. Accordingly, the trial court properly concluded that petitioners had not engaged in unacceptable personal conduct that is detrimental to state service and that there was no just cause for discipline.

Next, NCDENR argues that the trial court erred in concluding:

[A]s a separate and independent basis for overruling the disciplinary actions at issue in this case, . . . 25 NCAC 01J.0611 is void as applied on the particular facts in this case because it did not permit the exercise of discretion in determining appropriate disciplinary action[, and] on these specific facts, the disciplinary actions in this matter were arbitrary and capricious and not the product of reasoned decision making.

Because we affirm the trial court's reversal of the discipline for lack of just cause and because this conclusion was a separate and independent basis for reversing the SPC's decision, we need not address it.

**[3]** Additionally, NCDENR argues that the trial court erred in awarding prejudgment and postjudgment interest on petitioners' back pay awards. We note that "the State is not required to pay interest on its obligations unless it is required to do so by contract or by statute." *Faulkenbury v. Teachers' & State Employees' Ret. Sys.*, 132 N.C. App. 137, 149, 510 S.E.2d 675, 683 (1999). The State Personnel Commission rules specifically provide, "[t]he state shall *not* be required to pay interest on any back pay award." 25 N.C. Admin. Code 1B.0425 (2008) (emphasis added). Accordingly, we reverse the award of prejudgment and postjudgment interest on the back pay awards in the 19 April 2007 order.

**[4]** Finally, we must address an issue raised by NCDENR in its appeal and by petitioners in their cross-appeal. NCDENR argues that the 4 June 2007 order awarding attorney fees and costs to petitioners should be reversed because petitioners should not have been prevailing parties. In light of our analysis of the just cause issue, NCDENR's argument is without merit. Petitioners contend that the trial court erred in awarding partial attorney fees in the 4 June 2007 order because the court erred in failing to make findings of fact to support the reasonableness of the award. We agree.

A trial court's discretionary award of attorney fees and costs is governed by N.C.G.S. §§ 6-19.1 and 6-20, which provide:

> In any civil action . . . brought by a party who is contesting State action pursuant to G.S. 150B-43 . . . , unless the prevailing party is the State, the court may, in its discretion, allow the prevailing party to recover reasonable attorney's fees, including attorney's fees applicable to the administrative review portion of the case, in contested cases arising under Article 3 of Chapter 150B, to be taxed as court costs against the appropriate agency if:
>
> (1) The court finds that the agency acted without substantial justification in pressing its claim against the party; and
>
> (2) The court finds that there are no special circumstances that would make the award of attorney's fees unjust.

N.C. Gen. Stat. § 6-19.1 (2007). "[C]osts may be allowed in the discretion of the court." N.C. Gen. Stat. § 6-20 (2007).

In the case before us, the trial court concluded that NCDENR acted without substantial justification and that no special circumstances existed to make the award unjust. The court further found

that petitioners submitted information showing attorney fees of $102,239.40 and costs of $4,159.35. However, the court awarded only $51,119.70 in attorney fees and only $2,617.10 in costs. "Although the award of attorney's fees is within the discretion of the trial judge under N.C. Gen. Stat. § 6-19.1 (1986), the trial court must make findings of fact 'as to the time and labor expended, the skill required, the customary fee for like work, and the experience or ability of the attorney.' " *N.C. Dep't of Corr. v. Myers*, 120 N.C. App. 437, 442, 462 S.E.2d 824, 828 (1995) (internal quotation marks omitted) (quoting *United Labs. v. Kuykendall*, 335 N.C. 183, 195, 437 S.E.2d 374, 381 (1993)), *aff'd per curiam*, 344 N.C. 626, 476 S.E.2d 364 (1996). Here the court failed to make necessary findings of fact about the reasonableness of the award of attorney fees to enable this Court to determine whether the award was within the trial court's sound discretion or was an abuse thereof. Therefore, we must reverse and remand the 4 June 2007 order for findings of fact consistent with this opinion.

19 April 2007 order affirmed in part, reversed in part; 4 June 2007 order reversed and remanded for findings of fact.

Affirmed in part, reversed in part, and remanded.

Judges BRYANT and ARROWOOD concur.